# UNITED STATES *v.* CHADWICK ET AL.

No. 75-1721.   Argued April 26, 1977—Decided June 21, 1977

2

BURGER, C. J., delivered the opinion of the Court, in which BRENNAN, STEWART, WHITE, MARSHALL, POWELL, and STEVENS, JJ., joined. BRENNAN, J., filed a concurring opinion, *post*, p. 16. BLACKMUN, J., filed a dissenting opinion, in which REHNQUIST, J., joined, *post*, p. 17.

*Deputy Solicitor General Randolph* argued the cause for the United States. On the brief were *Acting Solicitor General Friedman, Assistant Attorney General Thornburgh, Kenneth S. Geller,* and *Sidney M. Glazer.*

*Martin G. Weinberg* argued the cause for respondents. With him on the brief were *Philip S. Nyman, Robert L. Steadman,* and *Jeanne Baker.*\*

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

We granted certiorari in this case to decide whether a search warrant is required before federal agents may open a locked footlocker which they have lawfully seized at the time of the arrest of its owners, when there is probable cause to believe the footlocker contains contraband.

## (1)

On May 8, 1973, Amtrak railroad officials in San Diego observed respondents Gregory Machado and Bridget Leary load a brown footlocker onto a train bound for Boston. Their suspicions were aroused when they noticed that the trunk was unusually heavy for its size, and that it was leaking talcum powder, a substance often used to mask the odor of marihuana or hashish. Because Machado matched a profile used to spot drug traffickers, the railroad officials reported these circumstances to federal agents in San Diego, who in turn relayed the information, together with detailed descriptions of Machado and the footlocker, to their counterparts in Boston.

When the train arrived in Boston two days later, federal narcotics agents were on hand. Though the officers had not obtained an arrest or search warrant, they had with them a police dog trained to detect marihuana. The agents identified Machado and Leary and kept them under surveillance as they claimed their suitcases and the footlocker, which had been

---

\**Joel M. Gora, Jack D. Novik,* and *John Reinstein* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging affirmance.

*Frank Carrington, Glen R. Murphy, Cecil Hicks,* and *James P. Costello* filed a brief for Americans for Effective Law Enforcement, Inc., et al. as *amici curiae.*

4

transported by baggage cart from the train to the departure area. Machado and Leary lifted the footlocker from the baggage cart, placed it on the floor and sat down on it.

The agents then released the dog near the footlocker. Without alerting respondents, the dog signaled the presence of a controlled substance inside. Respondent Chadwick then joined Machado and Leary, and they engaged an attendant to move the footlocker outside to Chadwick's waiting automobile. Machado, Chadwick, and the attendant together lifted the 200-pound footlocker into the trunk of the car, while Leary waited in the front seat. At that point, while the trunk of the car was still open and before the car engine had been started, the officers arrested all three. A search disclosed no weapons, but the keys to the footlocker were apparently taken from Machado.

Respondents were taken to the Federal Building in Boston; the agents followed with Chadwick's car and the footlocker. As the Government concedes, from the moment of respondents' arrests at about 9 p. m., the footlocker remained under the exclusive control of law enforcement officers at all times. The footlocker and luggage were placed in the Federal Building, where, as one of the agents later testified, "there was no risk that whatever was contained in the footlocker trunk would be removed by the defendants or their associates." App. 44. The agents had no reason to believe that the footlocker contained explosives or other inherently dangerous items, or that it contained evidence which would lose its value unless the footlocker were opened at once. Facilities were readily available in which the footlocker could have been stored securely; it is not contended that there was any exigency calling for an immediate search.

At the Federal Building an hour and a half after the arrests, the agents opened the footlocker and luggage. They did not obtain respondents' consent; they did not secure a search warrant. The footlocker was locked with a padlock and a

regular trunk lock. It is unclear whether it was opened with the keys taken from respondent Machado, or by other means. Large amounts of marihuana were found in the footlocker.[1]

Respondents were indicted for possession of marihuana with intent to distribute it, in violation of 21 U. S. C. § 841 (a)(1), and for conspiracy, in violation of 21 U. S. C. § 846. Before trial, they moved to suppress the marihuana obtained from the footlocker. In the District Court, the Government sought to justify its failure to secure a search warrant under the "automobile exception" of *Chambers* v. *Maroney,* 399 U. S. 42 (1970), and as a search incident to the arrests. Holding that "[w]arrantless searches are *per se* unreasonable, subject to a few carefully delineated and limited exceptions," the District Court rejected both justifications. 393 F. Supp. 763, 771 (Mass. 1975). The court saw the relationship between the footlocker and Chadwick's automobile as merely coincidental, and held that the double-locked, 200-pound footlocker was not part of "the area from within which [respondents] might gain possession of a weapon or destructible evidence." *Chimel* v. *California,* 395 U. S. 752, 763 (1969).

A divided Court of Appeals for the First Circuit affirmed the suppression of the seized marihuana. The court held that the footlocker had been properly taken into federal custody after respondents' lawful arrest; it also agreed that the agents had probable cause to believe that the footlocker contained a controlled substance when they opened it. But probable cause alone was held not enough to sustain the warrantless search.

---

[1] Marihuana was also found in the suitcases. The Court of Appeals found no adequate justification for the warrantless suitcase search, and suppressed this evidence. Incriminating statements made by respondent Chadwick during the arrest procedure were also suppressed, on the theory that there had not been probable cause to arrest him and that his statements were therefore tainted as the product of an illegal arrest. However, the petition for certiorari draws into question only the footlocker search; consequently, we need not pass on the legality of Chadwick's arrest or the search of the suitcases.

On the premise that warrantless searches are *per se* unreasonable unless they fall within some established exception to the warrant requirement, the Court of Appeals agreed with the District Court that the footlocker search was not justified either under the "automobile exception" or as a search incident to a lawful arrest.

The Court of Appeals then responded to an argument, suggested by the Government for the first time on appeal, that movable personalty lawfully seized in a public place should be subject to search without a warrant if there exists probable cause to believe it contains evidence of a crime. Conceding that such personalty shares some characteristics of mobility which support warrantless automobile searches, the court nevertheless concluded that a rule permitting a search of personalty on probable cause alone had not yet "received sufficient recognition by the Supreme Court outside the automobile area, or generally, for us to recognize it as a valid exception to the fourth amendment warrant requirement." 532 F. 2d 773, 781 (1976). We granted certiorari, 429 U. S. 814 (1976). We affirm.

(2)

In this Court the Government again contends that the Fourth Amendment Warrant Clause protects only interests traditionally identified with the home.[2] Recalling the colonial writs of assistance, which were often executed in searches of private dwellings, the Government claims that the Warrant Clause was adopted primarily, if not exclusively, in response to unjustified intrusions into private homes on the authority of general warrants. The Government argues there is no evidence that the Framers of the Fourth Amendment intended

---

[2] The Fourth Amendment provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

to disturb the established practice of permitting warrantless searches outside the home, or to modify the initial clause of the Fourth Amendment by making warrantless searches supported by probable cause *per se* unreasonable.

Drawing on its reading of history, the Government argues that only homes, offices, and private communications implicate interests which lie at the core of the Fourth Amendment. Accordingly, it is only in these contexts that the determination whether a search or seizure is reasonable should turn on whether a warrant has been obtained. In all other situations, the Government contends, less significant privacy values are at stake, and the reasonableness of a government intrusion should depend solely on whether there is probable cause to believe evidence of criminal conduct is present. Where personal effects are lawfully seized outside the home on probable cause, the Government would thus regard searches without a warrant·as not "unreasonable."

We do not agree that the Warrant Clause protects only dwellings and other specifically designated locales. As we have noted before, the Fourth Amendment "protects people, not places," *Katz* v. *United States,* 389 U. S. 347, 351 (1967); more particularly, it protects people from unreasonable government intrusions into their legitimate expectations of privacy. In this case, the Warrant Clause makes a significant contribution to that protection. The question, then, is whether a warrantless search in these circumstances was unreasonable.[3]

### (3)

It cannot be doubted that the Fourth Amendment's commands grew in large measure out of the colonists' experience

---

[3] In this Court the Government has limited the question presented to "[w]hether a search warrant is required before federal agents may open a locked footlocker that is properly in their possession and that they have probable cause to believe contains contraband." Accordingly, this case presents no issue of the application of the exclusionary rule.

8

with the writs of assistance and their memories of the general warrants formerly in use in England. These writs, which were issued on executive rather than judicial authority, granted sweeping power to customs officials and other agents of the King to search at large for smuggled goods. Though the authority to search granted by the writs was not limited to the home, searches conducted pursuant to them often were carried out in private residences. See generally *Stanford* v. *Texas,* 379 U. S. 476, 481–485 (1965); *Marcus* v. *Search Warrant,* 367 U. S. 717, 724–729 (1961); *Frank* v. *Maryland,* 359 U. S. 360 (1959).

Although the searches and seizures which deeply concerned the colonists, and which were foremost in the minds of the Framers, were those involving invasions of the home, it would be a mistake to conclude, as the Government contends, that the Warrant Clause was therefore intended to guard only against intrusions into the home. First, the Warrant Clause does not in terms distinguish between searches conducted in private homes and other searches. There is also a strong historical connection between the Warrant Clause and the initial clause of the Fourth Amendment, which draws no distinctions among "persons, houses, papers, and effects" in safeguarding against unreasonable searches and seizures. See *United States* v. *Rabinowitz,* 339 U. S. 56, 68 (1950) (Frankfurter, J., dissenting).

Moreover, if there is little evidence that the Framers intended the Warrant Clause to operate outside the home, there is no evidence at all that they intended to exclude from protection of the Clause all searches occurring outside the home. The absence of a contemporary outcry against warrantless searches in public places was because, aside from searches incident to arrest, such warrantless searches were not a large issue in colonial America. Thus, silence in the historical record tells us little about the Framers' attitude toward application of the Warrant Clause to the search of respond-

ents' footlocker.[4]   What we do know is that the Framers were men who focused on the wrongs of that day but who intended the Fourth Amendment to safeguard fundamental values which would far outlast the specific abuses which gave it birth.

Moreover, in this area we do not write on a clean slate. Our fundamental inquiry in considering Fourth Amendment issues is whether or not a search or seizure is reasonable under all the circumstances. *Cooper* v. *California,* 386 U. S. 58 (1967).   The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer "engaged in the often competitive enterprise of ferreting out crime." *Johnson* v. *United States,* 333 U. S. 10, 14 (1948). Once a lawful search has begun, it is also far more likely that it will not exceed proper bounds when it is done pursuant to a judicial authorization "particularly describing the place to be searched and the persons or things to be seized."   Further, a warrant assures the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search. *Camara* v. *Municipal Court,* 387 U. S. 523, 532 (1967).

Just as the Fourth Amendment "protects people, not places," the protections a judicial warrant offers against erro-

---

[4] The Government's historical analysis is further undercut by its own arguments.   The Government acknowledges that the core values the Fourth Amendment protects are privacy interests.   In its view, those privacy interests which should receive the "maximum protection from governmental search or seizure" provided by the Warrant Clause include private oral and electronic communication, "[i]n addition to the home and other structures such as an office or hotel room . . . ."   Brief for United States 30.   It is not readily apparent how the Government's contention that the Warrant Clause applies to high privacy areas, both within and without the home, can be reconciled with its earlier contention that judicial warrants are appropriate only for searches conducted within private dwellings.

neous governmental intrusions are effective whether applied in or out of the home. Accordingly, we have held warrantless searches unreasonable, and therefore unconstitutional, in a variety of settings.[5] A century ago, Mr. Justice Field, speaking for the Court, included within the reach of the Warrant Clause printed matter traveling through the mails within the United States:

"Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by the parties forwarding them in their own domiciles. The constitutional guaranty of the right of the people to be secure in their papers against unreasonable searches and seizures extends to their papers, thus closed against inspection, wherever they may be. Whilst in the mail, they can only be opened and examined under like warrant, issued upon similar oath or affirmation, particularly describing the thing to be seized, as is required when papers are subjected to search in one's own household." *Ex parte Jackson,* 96 U. S. 727, 733 (1878).

We reaffirmed *Jackson* in *United States* v. *Van Leeuwen,* 397 U. S. 249 (1970), where a search warrant was obtained to open two packages which, on mailing, the sender had declared contained only coins. Judicial warrants have been required for other searches conducted outside the home. *E. g., Katz* v. *United States,* 389 U. S. 347 (1967) (electronic interception of conversation in public telephone booth); *Coolidge* v. *New Hampshire,* 403 U. S. 443 (1971) (automobile on private

---

[5] In circumstances involving noncriminal inventory searches, where probable cause to search is irrelevant, we have recognized "that search warrants are not required, linked as the warrant requirement textually is to the probable-cause concept." *South Dakota* v. *Opperman,* 428 U. S. 364, 370 n. 5 (1976). This is so because the salutary functions of a warrant simply have no application in that context; the constitutional reasonableness of inventory searches must be determined on other bases.

premises); *Preston* v. *United States,* 376 U. S. 364 (1964) (automobile in custody); *United States* v. *Jeffers,* 342 U. S. 48 (1951) (hotel room); *G. M. Leasing Corp.* v. *United States,* 429 U. S. 338 (1977) (office); *Mancusi* v. *DeForte,* 392 U. S. 364 (1968) (office). These cases illustrate the applicability of the Warrant Clause beyond the narrow limits suggested by the Government. They also reflect the settled constitutional principle, discussed earlier, that a fundamental purpose of the Fourth Amendment is to safeguard individuals from unreasonable government invasions of legitimate privacy interests,[6] and not simply those interests found inside the four walls of the home. *Wolf* v. *Colorado,* 338 U. S. 25, 27 (1949).

In this case, important Fourth Amendment privacy interests were at stake. By placing personal effects inside a double-locked footlocker, respondents manifested an expectation that the contents would remain free from public examination. No less than one who locks the doors of his home against intruders, one who safeguards his personal possessions in this manner is due the protection of the Fourth Amendment Warrant Clause. There being no exigency, it was unreasonable for the Government to conduct this search without the safeguards a judicial warrant provides.

### (4)

The Government does not contend that the footlocker's brief contact with Chadwick's car makes this an automobile search, but it is argued that the rationale of our automobile

---

[6] This has been settled law in this Court for over 90 years. At least since *Boyd* v. *United States,* 116 U. S. 616 (1886), we have known that "[i]t is not the breaking of his doors, and the rummaging of his drawers, that constitutes the essence of the offence; but it is the invasion of his indefeasible right of personal security, personal liberty and private property . . . ." *Id.,* at 630.

This is not to say that the Fourth Amendment translates precisely into a constitutional privacy right. See *Katz* v. *United States,* 389 U. S. 347, 350–351 (1967).

search cases demonstrates the reasonableness of permitting warrantless searches of luggage; the Government views such luggage as analogous to motor vehicles for Fourth Amendment purposes. It is true that, like the footlocker in issue here, automobiles are "effects" under the Fourth Amendment, and searches and seizures of automobiles are therefore subject to the constitutional standard of reasonableness. But this Court has recognized significant differences between motor vehicles and other property which permit warrantless searches of automobiles in circumstances in which warrantless searches would not be reasonable in other contexts. *Carroll* v. *United States,* 267 U. S. 132 (1925); *Preston* v. *United States, supra,* at 366–367; *Chambers* v. *Maroney,* 399 U. S. 42 (1970). See also *South Dakota* v. *Opperman,* 428 U. S. 364, 367 (1976).

Our treatment of automobiles has been based in part on their inherent mobility, which often makes obtaining a judicial warrant impracticable. Nevertheless, we have also sustained "warrantless searches of vehicles . . . in cases in which the possibilities of the vehicle's being removed or evidence in it destroyed were remote, if not nonexistent." *Cady* v. *Dombrowski,* 413 U. S. 433, 441–442 (1973); accord, *South Dakota* v. *Opperman, supra,* at 367; see *Texas* v. *White,* 423 U. S. 67 (1975); *Chambers* v. *Maroney, supra; Cooper* v. *California,* 386 U. S. 58 (1967).

The answer lies in the diminished expectation of privacy which surrounds the automobile:

> "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. . . . It travels public thoroughfares where both its occupants and its contents are in plain view." *Cardwell* v. *Lewis,* 417 U. S. 583, 590 (1974) (plurality opinion).

Other factors reduce automobile privacy. "All States require

vehicles to be registered and operators to be licensed. States and localities have enacted extensive and detailed codes regulating the condition and manner in which motor vehicles may be operated on public streets and highways." *Cady* v. *Dombrowski, supra,* at 441. Automobiles periodically undergo official inspection, and they are often taken into police custody in the interests of public safety. *South Dakota* v. *Opperman, supra,* at 368.

The factors which diminish the privacy aspects of an automobile do not apply to respondents' footlocker. Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile.

Nor does the footlocker's mobility justify dispensing with the added protections of the Warrant Clause. Once the federal agents had seized it at the railroad station and had safely transferred it to the Boston Federal Building under their exclusive control, there was not the slightest danger that the footlocker or its contents could have been removed before a valid search warrant could be obtained.[7] The initial seizure and detention of the footlocker, the validity of which respondents do not contest, were sufficient to guard against any risk that evidence might be lost. With the footlocker safely immobilized, it was unreasonable to undertake the additional and greater intrusion of a search without a warrant.[8]

---

[7] This may often not be the case when automobiles are seized. Absolutely secure storage facilities may not be available, see *South Dakota* v. *Opperman,* 428 U. S. 364 (1976); *Cady* v. *Dombrowski,* 413 U. S. 433 (1973), and the size and inherent mobility of a vehicle make it susceptible to theft or intrusion by vandals.

[8] Respondents' principal privacy interest in the footlocker was, of

Finally, the Government urges that the Constitution permits the warrantless search of any property in the possession of a person arrested in public, so long as there is probable cause to believe that the property contains contraband or evidence of crime. Although recognizing that the footlocker was not within respondents' immediate control, the Government insists that the search was reasonable because the footlocker was seized contemporaneously with respondents' arrests and was searched as soon thereafter as was practicable. The reasons justifying search in a custodial arrest are quite different. When a custodial arrest is made, there is always some danger that the person arrested may seek to use a weapon, or that evidence may be concealed or destroyed. To safeguard himself and others, and to prevent the loss of evidence, it has been held reasonable for the arresting officer to conduct a prompt, warrantless "search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence." *Chimel* v. *California,* 395 U. S., at 763. See also *Terry* v. *Ohio,* 392 U. S. 1 (1968).

Such searches may be conducted without a warrant, and they may also be made whether or not there is probable cause to believe that the person arrested may have a weapon or is about to destroy evidence. The potential dangers lurking in

course, not in the container itself, which was exposed to public view, but in its contents. A search of the interior was therefore a far greater intrusion into Fourth Amendment values than the impoundment of the footlocker. Though surely a substantial infringement of respondents' use and possession, the seizure did not diminish respondents' legitimate expectation that the footlocker's contents would remain private.

It was the greatly reduced expectation of privacy in the automobile, coupled with the transportation function of the vehicle, which made the Court in *Chambers* unwilling to decide whether an immediate search of an automobile, or its seizure and indefinite immobilization, constituted a greater interference with the rights of the owner. This is clearly not the case with locked luggage.

all custodial arrests make warrantless searches of items within the "immediate control" area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved. *United States* v. *Robinson,* 414 U. S. 218 (1973); *Terry* v. *Ohio, supra.* However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest," *Preston* v. *United States,* 376 U. S., at 367, or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.[9]

Here the search was conducted more than an hour after federal agents had gained exclusive control of the footlocker and long after respondents were securely in custody; the search therefore cannot be viewed as incidental to the arrest or as justified by any other exigency. Even though on this record the issuance of a warrant by a judicial officer was reasonably predictable, a line must be drawn. In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be searched comes under the exclusive dominion of police authority. Respondents were therefore entitled to the protection of the Warrant Clause with the

---

[9] Of course, there may be other justifications for a warrantless search of luggage taken from a suspect at the time of his arrest; for example, if officers have reason to believe that luggage contains some immediately dangerous instrumentality, such as explosives, it would be foolhardy to transport it to the station house without opening the luggage and disarming the weapon. See, *e. g., United States* v. *Johnson,* 467 F. 2d 630, 639 (CA2 1972).

16

evaluation of a neutral magistrate, before their privacy interests in the contents of the footlocker were invaded.[10]

Accordingly, the judgment is

*Affirmed.*

Mr. Justice Brennan, concurring.

I fully join The Chief Justice's thorough opinion for the Court. I write only to comment upon two points made by my Brother Blackmun's dissent.

First, I agree wholeheartedly with my Brother Blackmun that it is "unfortunate" that the Government in this case "sought . . . to vindicate an extreme view of the Fourth Amendment." *Post,* at 17. It is unfortunate, in my view, not because this argument somehow "distract[ed]" the Court from other more meritorious arguments made by the Government—these arguments are addressed and convincingly rejected in the Court's opinion—but because it is deeply distressing that the Department of Justice, whose mission is to protect the constitutional liberties of the people of the United States, should even appear to be seeking to subvert them by extreme and dubious legal arguments. It is gratifying that the Court today unanimously rejects the Government's position.

Second, it should be noted that while Part II of the dissent suggests a number of possible alternative courses of action that the agents could have followed without violating the Constitution, no decision of this Court is cited to support the constitutionality of these courses, but only some decisions of Courts of Appeals. *Post,* at 23, nn. 4 and 5. In my view, it is not at all obvious that the agents could

[10] Unlike searches of the person, *United States* v. *Robinson,* 414 U. S. 218 (1973); *United States* v. *Edwards,* 415 U. S. 800 (1974), searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest. Respondents' privacy interest in the contents of the footlocker was not eliminated simply because they were under arrest.

legally have searched the footlocker had they seized it after Machado and Leary had driven away with it in their car[1] or "at the time and place of the arrests."[2]

MR. JUSTICE BLACKMUN, with whom MR. JUSTICE REHNQUIST joins, dissenting.

I think it somewhat unfortunate that the Government sought a reversal in this case primarily to vindicate an extreme view of the Fourth Amendment that would restrict the protection of the Warrant Clause to private dwellings and a few other "high privacy" areas. I reject this argument for the reasons stated in Parts (2) and (3) of the Court's opinion, with which I am in general agreement. The overbroad nature of the Goverment's principal argument, however, has served to distract the Court from the more important task of defining the proper scope of a search incident to an arrest. The Court fails to accept the opportunity this case presents to apply the rationale of recent decisions and develop a clear doctrine concerning the proper consequences

[1] While the contents of the car could have been searched pursuant to the automobile exception, it is by no means clear that the contents of locked containers found inside a car are subject to search under this exception, any more than they would be if the police found them in any other place.

[2] When Machado and Leary were "standing next to [the] open automobile trunk containing the footlocker," and even when they "were seated on it," *post*, at 23, it is not obvious to me that the contents of the heavy, securely locked footlocker were within the area of their "immediate control" for purposes of the search-incident-to-arrest doctrine, the justification for which is the possibility that the arrested person might have immediate access to weapons that might endanger the officer's safety or assist in his escape, or to items of evidence that he might conceal or destroy. I would think that the footlocker in this case hardly was " 'within [respondents'] immediate control'—construing that phrase to mean the area from within which [they] might gain possession of a weapon or destructible evidence." *Chimel* v. *California*, 395 U. S. 752, 763 (1969).

18

of custodial arrest. Accordingly, I dissent from the judgment.

I

One line of recent decisions establishes that no warrant is required for the arresting officer to search the clothing and effects of one placed in custodial arrest. The rationale for this was explained in *United States* v. *Robinson,* 414 U. S. 218 (1973):

> "A police officer's determination as to how and where to search the person of a suspect whom he has arrested is necessarily a quick *ad hoc* judgment which the Fourth Amendment does not require to be broken down in each instance into an analysis of each step in the search. The authority to search the person incident to a lawful custodial arrest, while based upon the need to disarm and to discover evidence, does not depend on what a court may later decide was the probability in a particular arrest situation that weapons or evidence would in fact be found upon the person of the suspect. A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." *Id.,* at 235.

Accord, *Gustafson* v. *Florida,* 414 U. S. 260 (1973). Under this doctrine, a search of personal effects need not be contemporaneous with the arrest, and indeed may be delayed a number of hours while the suspect remains in lawful custody. *United States* v. *Edwards,* 415 U. S. 800 (1974).

A second series of decisions concerns the consequences of custodial arrest of a person driving an automobile. The car

may be impounded and, with probable cause, its contents (including locked compartments) subsequently examined without a warrant. *Texas* v. *White,* 423 U. S. 67 (1975); *Cady* v. *Dombrowski,* 413 U. S. 433, 439–448 (1973); *Chambers* v. *Maroney,* 399 U. S. 42, 47–52 (1970). Moreover, once a car has been properly impounded for any reason, the police may follow a standard procedure of inventorying its contents without any showing of probable cause. *South Dakota* v. *Opperman,* 428 U. S. 364 (1976).

I would apply the rationale of these two lines of authority and hold generally that a warrant is not required to seize and search any movable property in the possession of a person properly arrested in a public place. A person arrested in a public place is likely to have various kinds of property with him: items inside his clothing, a briefcase or suitcase, packages, or a vehicle. In such instances the police cannot very well leave the property on the sidewalk or street while they go to get a warrant. The items may be stolen by a passer-by or removed by the suspect's confederates. Rather than requiring the police to "post a guard" over such property, I think it is surely reasonable for the police to take the items along to the station with the arrested person.

In the present case the Court of Appeals held, and respondents do not contest, that it was proper for the federal agents to seize the footlocker and take it to their office. Given the propriety of seizing the footlocker, there is some reason to believe that the subsequent search *a fortiori* was permissible. See *Chambers* v. *Maroney,* 399 U. S., at 51–52. I acknowledge, however, that impounding the footlocker without searching it would have been a less intrusive alternative in this case. The police could have waited to conduct their search until after a warrant had been obtained. Nevertheless, the mere fact that a warrant could have been obtained while the footlocker was safely impounded does not necessarily make the warrantless search unreasonable. See, *e. g., United States*

v. *Edwards,* 415 U. S., at 805; *Cardwell* v. *Lewis,* 417 U. S. 583, 595–596 (1974) (plurality opinion).

As the Court in *Robinson* recognized, custodial arrest is such a serious deprivation that various lesser invasions of privacy may be fairly regarded as incidental. An arrested person, of course, has an additional privacy interest in the objects in his possession at the time of arrest. To be sure, allowing impoundment of those objects pursuant to arrest, but requiring a warrant for examination of their contents, would protect that incremental privacy interest in cases where the police assessment of probable cause is subsequently rejected by a magistrate. But a countervailing consideration is that a warrant would be routinely forthcoming in the vast majority of situations where the property has been seized in conjunction with the valid arrest of a person in a public place. I therefore doubt that requiring the authorities to go through the formality of obtaining a warrant in this situation would have much practical effect in protecting Fourth Amendment values.[1]

I believe this sort of practical evaluation underlies the Court's decisions permitting clothing, personal effects, and automobiles to be searched without a warrant as an incident of arrest, even though it would be possible simply to impound these items until a warrant could be obtained. The Court's opinion does not explain why a wallet carried in the arrested person's clothing, but not the footlocker in the present case, is subject to "reduced expectations of privacy caused by

---

[1] A search warrant serves additional functions where an arrest takes place in a home or office. The warrant assures the occupants that the officers have legal authority to conduct the search and defines the area to be searched and the objects to be seized. See *Camara* v. *Municipal Court,* 387 U. S. 523, 532 (1967). But a warrant would serve none of these functions where the arrest takes place in a public area and the authorities are admittedly empowered to seize the objects in question. Cf. *United States* v. *Watson,* 423 U. S. 411, 414–424 (1976) (warrant not required for arrest, based on probable cause, in public place).

the arrest." *Ante,* at 16 n. 10. Nor does the Court explain how such items as purses or briefcases fit into the dichotomy.[2] Perhaps the holding in the present case will be limited in the future to objects that are relatively immobile by virtue of their size or absence of a means of propulsion.

It is also possible that today's decision will not have much impact because other doctrines often will be available to sustain warrantless searches of objects in police custody. As the Court acknowledges, *ante,* at 15 n. 9, no warrant is necessary when the authorities suspect the object they have impounded has dangerous contents. Moreover, police may establish a routine procedure of inventorying the contents of any container taken into custody, for reasons of security and property conservation. Cf. *South Dakota* v. *Opperman,* 428 U. S. 364 (1976). Law enforcement officers should not be precluded from conducting an inventory search when they take a potential "Trojan horse" into their office. Finally, exigent circumstances may often justify an immediate search of property seized in conjunction with an arrest, in order to facilitate the apprehension of confederates or the termination of continuing criminal activity. Cf. *Warden* v. *Hayden,* 387 U. S. 294, 298–300 (1967).

Since one of the preceding special circumstances is likely to be available in most instances, and since the suspect's expectations of privacy are properly abated by the fact of arrest itself, it would be better, in my view, to adopt a clear-cut rule permitting property seized in conjunction with a valid arrest in a public place to be searched without a warrant.

---

[2] The Courts of Appeals generally have held that it is proper for the police to seize a briefcase or package in the possession of a person at the time of arrest, and subsequently to search the property without a warrant after the arrested person has been taken into custody. See, *e. g., United States* v. *Schleis,* 543 F. 2d 59 (CA8 1976), cert. pending, No. 76–5722; *United States* v. *Battle,* 166 U. S. App. D. C. 396, 510 F. 2d 776 (1975); *United States ex rel. Muhammad* v. *Mancusi,* 432 F. 2d 1046 (CA2 1970), cert. denied, 402 U. S. 911 (1971).

Such an approach would simplify the constitutional law of criminal procedure without seriously derogating from the values protected by the Fourth Amendment's prohibition of unreasonable searches and seizures.[3]

## II

The approach taken by the Court has the perverse result of allowing fortuitous circumstances to control the outcome of the present case. The agents probably could have avoided having the footlocker search held unconstitutional either by delaying the arrest for a few minutes or by conducting the search on the spot rather than back at their office. Probable cause for the arrest was present from the time respondents Machado and Leary were seated on the footlocker inside Boston's South Station and the agents' dog signaled the presence of marihuana. Rather than make an arrest at this moment, the agents commendably sought to determine the possible involvement of others in the illegal scheme. They waited a short time until respondent Chadwick arrived and the footlocker had been loaded into the trunk of his car, and then made the arrest. But if the agents had postponed the arrest just a few minutes longer until the respondents started to drive away, then the car could have been

---

[3] " 'My basic premise is that Fourth Amendment doctrine, given force and effect by the exclusionary rule, is primarily intended to regulate the police in their day-to-day activities and thus ought to be expressed in terms that are readily applicable by the police in the context of the law enforcement activities in which they are necessarily engaged. A highly sophisticated set of rules, qualified by all sorts of ifs, ands, and buts and requiring the drawing of subtle nuances and hairline distinctions, may be the sort of heady stuff upon which the facile minds of lawyers and judges eagerly feed, but they may be 'literally impossible of application by the officer in the field.' " LaFave, "Case-by-Case Adjudication" versus "Standardized Procedures": The Robinson Dilemma, 1974 Sup. Ct. Rev. 127, 141 (footnotes omitted), quoting United States v. Robinson, 153 U. S. App. D. C. 114, 154, 471 F. 2d 1082, 1122 (1972) (dissenting opinion), rev'd, 414 U. S. 218 (1973).

seized, taken to the agents' office, and all its contents—including the footlocker—searched without a warrant.[4]

Alternatively, the agents could have made a search of the footlocker at the time and place of the arrests. Machado and Leary were standing next to an open automobile trunk containing the footlocker, and thus it was within the area of their "immediate control." And certainly the footlocker would have been properly subject to search at the time if the arrest had occurred a few minutes earlier while Machado and Leary were seated on it.[5]

---

[4] The scope of the "automobile search" exception to the warrant requirement extends to the contents of locked compartments, including glove compartments and trunks. See cases cited *supra*, at 19. The Courts of Appeals have construed this doctrine to include briefcases, suitcases, and footlockers inside automobiles. *United States* v. *Tramunti,* 513 F. 2d 1087, 1104–1105 (CA2 1975); *United States* v. *Issod,* 508 F. 2d 990, 993 (CA7 1974), cert. denied, 421 U. S. 916 (1975); *United States* v. *Soriano,* 497 F. 2d 147 (CA5 1974) (en banc), convictions summarily aff'd *sub nom. United States* v. *Aviles,* 535 F. 2d 658 (1976), cert. pending, Nos. 76–5132 and 76–5143; *United States* v. *Evans,* 481 F. 2d 990, 993–994 (CA9 1973).

[5] *Chimel* v. *California,* 395 U. S. 752, 763 (1969), authorizes an on-the-spot search of the area within the "immediate control" of an arrested person. It is well established that an immediate search of packages or luggage carried by an arrested person is proper. See *Draper* v. *United States,* 358 U. S. 307, 310–311 (1959). Such searches have been sustained by the Courts of Appeals even if they occurred after the arrested person had been handcuffed and thus could no longer gain access to the property in question. *United States* v. *Eatherton,* 519 F. 2d 603, 609–610 (CA1), cert. denied, 423 U. S. 987 (1975); *United States* v. *Kaye,* 492 F. 2d 744 (CA6 1974); *United States* v. *Mehciz,* 437 F. 2d 145 (CA9), cert. denied, 402 U. S. 974 (1971). Searches under the *Chimel* rationale have also been approved when the suitcase or briefcase was close by, but not touching, the arrested person. *United States* v. *French,* 545 F. 2d 1021 (CA5 1977) (suitcase "within an arm's length" of arrested person); *United States* v. *Frick,* 490 F. 2d 666 (CA5 1973), cert. denied *sub nom. Peterson* v. *United States,* 419 U. S. 831 (1974) (briefcase lying on seat of automobile next to which person was arrested).

In many cases, of course, small variations in the facts are determinative of the legal outcome. Criminal law necessarily involves some line drawing. But I see no way that these alternative courses of conduct, which likely would have been held constitutional under the Fourth Amendment, would have been any more solicitous of the privacy or well-being of the respondents. Indeed, as Judge Thomsen observed in dissenting from this aspect of the Court of Appeals' decision that is today affirmed, the course of conduct followed by the agents in this case was good police procedure.[6] It is decisions of the kind made by the Court today that make criminal law a trap for the unwary policeman and detract from the important activities of detecting criminal activity and protecting the public safety.

---

[6] "A railroad station, after the arrival of a train, is not a good place to conduct such an arrest and search, especially when the agents did not know whether one or more men might respond to the telephone call Machado had made. Nor is a street outside the station a good place to open a footlocker containing marijuana. The agents acted wisely in arresting Machado at the car, and in postponing until they arrived at JFK opening the footlocker, to confirm the fact that it contained contraband." 532 F. 2d 773, 786 (1976).

I might add that postponing the arrest until after the car was started would have increased the likelihood that respondents would attempt to evade arrest, possibly endangering innocent bystanders.