FRIENDLY, Circuit Judge:
Mario Diaz appeals from a judgment of the District Court for the Southern District of New York convicting him, after a trial, on three counts of an indictment. The first count charged Diaz with conspiring to distribute heroin and to possess heroin with intent to distribute it, in violation of 21 U.S.C. § 846. The two other counts charged him with the substantive crimes of distribution of and possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A). He was sentenced to concurrent terms of 10 years imprisonment on each count and a 10 year special parole term thereafter. The sole ground of appeal is the court’s refusal to suppress $14,000 in currency found by DEA Detective Campbell in a water closet tank in an apartment which Diaz was sharing with Ms. Laura Torres at the time of his arrest.
This narrowing of the many suppression claims originally raised is a result of the meticulous findings of Judge Haight, which have also been of great assistance to us. To understand the one point still at issue, we need to recount only a few of the many events of the night of May 4-5, 1977 when the seizure here in question occurred.
These began with an endeavor by DEA agents to purchase two ounces of heroin from Rolando Watley in midtown Manhattan. Later developments gave the agents reason to think that Diaz was Watley’s supplier. They followed Diaz’ taxi to an apartment building in Queens, where there occurred other highly significant incidents unnecessary here to detail. After obtaining legal advice, the correctness of which is unchallenged, that there was probable cause to arrest Diaz,[1] attempting to gain peaceful access to the Diaz-Torres apartment, giving notice of their authority and purpose, and hearing the flushing of a toi *823 let, the officers broke down the door. Diaz was standing close by; after a brief struggle, he was arrested, handcuffed and advised of his rights. Ms. Torres, who was near him, was likewise so advised. After about 15 minutes two officers removed Diaz to police headquarters.
Immediately after ' entering the apartment the officers checked it to make sure that no one else was there. During the course of this check Agent Daly observed scraps of paper in the bowl of the toilet in one of the apartment’s two bathrooms; the toilet was trickling with a continuous motion. The papers consisted, in part, of a red cover of what appeared to be a telephone book and blue lined paper with telephone numbers.
Detective Campbell, who had arrived at the apartment after entrance had been gained and heard talk about the flushing of a toilet, proceeded to the basement to obtain the aid of the superintendent of the apartment building in getting at the traps. This endeavor led to the discovery of another red cover and more paper with telephone numbers.
When Campbell returned to the apartment, he found Sergeant Kreusi, who was in charge of the operation, and Agent Daly in the living room, talking with Ms. Torres in an effort to obtain her consent to a search of the apartment. When this search began, Campbell was instructed to watch over the papers. For a reason not clear from the record, Campbell walked down the hall toward the bedroom, without objection from Ms. Torres. At this point we had best quote Judge Haight’s findings:
On his way, he heard the sound of a constantly running toilet. He asked Torres what was wrong with the toilet, and she responded that it had given continuous trouble. Campbell, familiar as a home owner with the manner in which toilet tanks keep running and steps that can be taken to stop them, went into the bathroom and took off the top of the water closet tank. He thereupon observed, “stuffed into the works,” a large brown paper bag. He pulled out the bag, opened it, and discovered about $14,000 in cash. Campbell advised Kruesi of this find, who instructed Campbell to place the money in the dining room, where it was subsequently counted, and then removed from the apartment by the police. Campbell testified that after lifting the package out of the tank, the toilet stopped running; “it was just that it was jammed with the package that was in there.” In contrast with other aspects of the evidence, there is no dispute as to how this package of money came to be found. Torres confirmed that the toilet was running; that Campbell mentioned it to her; and that she told him about her problems with the toilets and that the superintendent had not been able to fix them properly.
Although holding that the Government had not sustained its burden of showing a consent to the search of the apartment[2] and therefore suppressing items found in the course of the search, the judge concluded that the money found in the toilet tank should be received in evidence under the plain view doctrine. He took as the controlling standard our statement in United States v. Berenguer, 562 F.2d 206, 210 (2 Cir. 1977), that, under the plurality opinion in Coolidge v. New Hampshire, 403 U.S. 443, 464-69, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), the plain view doctrine will support a warrantless search and seizure if but only if three conditions are satisfied, to wit:
(1) the agents must be lawfully on the premises; (2) the discovery must be inadvertent; and (3) its incriminating nature must be immediately apparent,
and found that all had been.
• [1,2] Diaz’ principal claim is that Agent Campbell was not “lawfully on the premis *824 es” when he removed the top of the water closet. The judge believed he was since, the entry into the apartment having been legal, the agents could lawfully remain for a reasonable period in an endeavor to persuade Ms. Torres to consent to a search. Diaz responds that the search, found by the judge to have been unconsented, was already in progress before Campbell entered the bathroom. It seems to us, however, that the agents’ presence remained lawful if, as clearly is the case, they entertained a good faith belief that consent had been obtained. Alternatively, while under Chimel v. California, 395 U.S. 752, 762-64, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), Diaz’ arrest did not entitle the agents to make a wider search of the apartment than they initially did, they were not required immediately to leave it, with the attendant serious risk that Ms. Torres would remove or destroy contraband or evidence of crime, but could maintain surveillance of the apartment[3] until a search warrant could be obtained. See United States v. Rodriguez, 532 F.2d 834, 838-39 (2 Cir. 1976); Griswold, Criminal Procedure — Is It a Means or an End?, 29 Md.L.Rev. 307, 317 (1969), quoted in Kamisar, La Fave & Israel, Modern Criminal Procedure 282-83 (4 ed. 1974). Although Ms. Torres may not have consented to a search of the apartment, there is nothing to indicate that she objected to Campbell’s walking down the hallway or applying his homeowner’s skill to the continuously troublesome toilet in the hope that he might succeed where the superintendent had failed. Indeed, her attitude as to his doing this seems to have been affirmative.[4]
The requirement of inadvertence is clearly satisfied. There is no suggestion that the real intention of Campbell, whom the judge characterized as “a particularly straight forward and dependable witness,” was not the beneficent one he professed but rather a desire to search the toilet tank.
Diaz’ final argument relates to the third requirement and perhaps also to the very nature of “plain view.” He contends that, just as the plain view of the billfold in United States v. Berenguer, supra, 562 F.2d at 210, did not justify examining it for its contents, so the plain view of the brown bag did not justify opening it. The essential distinction is that there is nothing “incriminating” in a billfold lying on a bureau but there is in a large paper bag “stuffed into the works” of a toilet, particularly one in which inculpatory evidence had just been flushed. The record is not altogether clear whether, when the bag was seized, the currency was perceptible by sight or touch. If so, it too could be seized as in plain view. If not, having legitimately seized the paper bag, Detective Campbell was entitled to open it and examine the contents even if we should assume that United States v. Chadwick, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), was applicable to a seizure of the sort that occurred here. In contrast to Chadwick, where “[t]he agents had no reason to believe that the footlocker . contained evidence which would lose its value unless the footlocker were opened at once,” 433 U.S. at 4, 97 S.Ct. at 2480, the contents of the bag were wet and presumably deteriorating. Moreover, we have held that the decision in Chadwick prohibiting warrantless searches of containers lawfully seized and in police custody is not retroactive to searches, like that here, which preceded it. United States v. Reda, 563 F.2d 510 (2 Cir. 1977).
Affirmed.

. Diaz has abandoned the contention, ruled against him by Judge Haight, that the officers deliberately delayed his arrest until he was inside the apartment. Cf. Vale v. Louisiana, 399 U.S. 30, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970); Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v. Cravero, 545 F.2d 406, 413-14 (5 Cir. 1976), cert. denied, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977); McKnight v. United States, 87 U.S.App.D.C. 151, 183 F.2d 977 (1950).

. The Government urges that, if necessary for affirmance, we should reject this conclusion. However, “the question whether a consent to a search was in fact ‘voluntary’ or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances.” Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973), and the judge’s conclusion was not clearly erroneous.

. There was no other practical means of securing the apartment until a warrant could be obtained, since there was no probable cause to arrest Ms. Torres, and her children were asleep in the apartment.

. Nothing in the record suggests that Ms. Torres had any notion what Campbell would find in the toilet.