OPINION OF THE COURT
Phylis Skloot Bamberger, J.
The defendant is charged with criminal possession of more than 16 ounces of marihuana. (Penal Law § 221.25.) He made a motion to suppress marihuana, currency and information derived from documents in his wallet seized from him on February 1, 1991, after his vehicle was stopped on a highway in the Bronx. The parties agreed to proceed on a stipulated record in lieu of a hearing. The record consists of the omnibus motion papers, three appendices, and the memoranda submitted on the issue of whether suppression should be granted. For the reasons set out, the defendant’s motion to suppress is granted in part and denied in part. The marihuana may be used by the People; the currency and information from the wallet, as well as records of defendant’s conversations about *850 the incident that took place on February 1, 1991, are suppressed.
FACTS
Most of the information necessary to determine the legality of the search and seizure was supplied by Special Agent J. Michael Smith’s affidavits, which are part of the appendices. Agent Smith’s training and expertise was not challenged by the defendant. At the time of the seizure, Smith had been with the Drug Enforcement Administration (DEA) for SV2 years. He had participated in over 250 narcotics-related arrests. He had extensive training in narcotics investigations, including the methods of operation used by traffickers, the methods of importing and distributing narcotics, and the use of codes to conduct narcotics transactions. Before joining the DEA, Smith had been a police officer in New Jersey for seven years and had participated in over 100 narcotics arrests.
The seizure of evidence from the defendant was an offshoot of a joint investigation undertaken by the DEA and New York State law enforcement authorities. The purpose of the investigation was to identify the members of a drug-dealing organization, its suppliers and customers, and to locate stash and distribution locations. The investigation began at least as early as September 27, 1990, when several eavesdropping warrants were issued permitting the authorities to gather information concerning narcotics trafficking being done by a large number of people including Angel Martinez and his brother Mickey.
Through the wiretaps, surveillance and a confidential informant, Agent Smith had established, by January 17, 1991, that the Martinez organization used an apartment at 2230 University Avenue in the Bronx to store and package heroine for sale; that 2160 Walton Avenue was being used to store narcotics and narcotics packaging paraphernalia; and that 1120 Wyatt Avenue was a location used by the organization to discuss their narcotics business. Moreover, Smith was aware that the DEA’s wiretaps "show[ed] a pattern of conversations that are coded, cryptic and carefully worded.” According to Smith, the intercepted conversations contain repeated references to "iron and board” and "for clothes,” which he believed to be references to narcotics packaging paraphernalia. Narcotics, Smith averred, were discussed in terms of "food,” "bottles,” "cases of beer,” and "clothes.”
*851 It is evident from the Smith affidavit dated February 7, 1991, that the search and seizure at issue here was made because of conversations intercepted between December 26, 1990, and January 31, 1991, and because of surveillance conducted by agents involved in the investigation. Wiretapped telephone calls on December 26, 1990, indicated that Angel and Mickey were each told by other members of the drug ring that a new source of supply was available. The next day, December 27, 1990, Angel called the defendant (whom he called "Phil”) at the defendant’s liquor store, Patterson Wines and Liquors, in Putnam County to arrange a meeting. Subsequent taped conversations and surveillance showed the defendant met with Angel and Mickey and discussed with them packages, meetings, and deliveries. The defendant also said he needed to "get something” from Angel, which the agents interpreted to mean he needed payment for a delivery. Defendant was also seen arriving at a meeting in a grey and black Chevrolet truck.
On January 29, 1991, Angel called the defendant at the home of his girlfriend, Martha Sweeney. The defendant told Angel that he had "a bunch and they’re fifteen (15), but I got, you got to do the bunch. There’s about twenty-five of them.” The defendant also said:
"Bill: Umh, umh, remember what I left, left.
"Angel: Yeah.
"Bill: Latest thing.
"Angel: Umh-huh.
"Bill: It was sixteen (16)?
"Angel: Yeah.”
Then they agreed to speak on January 31, 1991, to set up a time to meet the next day, February 1, 1991.
Based upon his knowledge of the investigation, Agent Smith believed that the defendant told Angel he had narcotics (a "bunch”) for him and Angel could get them at "15” if he did the "whole bunch.” Smith further believed that the defendant reminded Angel of the last deal, on January 16, 1991, and that the price of that deal was "16.”
On January 31, 1991, at 11:25 p.m., Angel called the defen *852 dont at Martha Sweeney’s home. The defendant told Angel he had "ten (10) things packed up” and Angel could "just take the ten (10) don’t worry about it.” They agreed to meet at 11 o’clock the next morning at a site they had already discussed. The site was not specified in the conversation. Also, the defendant told Angel, "I need you to bring something, whatever you can bring for me.”
On February 1, 1991, the DEA agents put the defendant under surveillance. They followed the defendant from the Sweeney home to a bank and then to his liquor store. At the store, they observed him putting a large brown cardboard box into his Blazer. Then they followed him as he drove from Putnam County into the Bronx. The agents stopped him on the Henry Hudson Parkway. There is nothing to show that the agents were in uniform or carried identification or that they showed any identification to the defendant. With machine guns and handguns drawn, the agents forcibly removed the defendant from his vehicle. He was handcuffed and told to lie face down on the ground. Meanwhile, DEA agents searched his truck. They found $70,000 in small denominations of cash and a small amount of marihuana in a brown leather shoulder bag. The shoulder bag also contained personal papers belonging to the defendant and Martha Sweeney. These papers, the cash, and the marihuana were seized.
In the rear of the Blazer, the agents found a cardboard box. They opened it and found approximately 10 pounds of marihuana packaged in 10 separate plastic bags. This was also seized. Finally, Agent Kerrigan removed the defendant’s wallet from the truck and discovered that it contained a piece of paper with Mickey’s telephone number and Angel’s beeper number. Kerrigan made a note of this and then replaced the paper.
The defendant was put into a BMW while still in handcuffs. He was advised of his Miranda rights and told that he was stopped because he matched the description of a person who had just robbed a bank in Westchester County. The People have conceded that this story was a lie; the DEA stopped him because they believed he was carrying drugs in his vehicle.
After the defendant was interrogated, he was told he was not the bank robber, and he was released. He was allowed to get into his truck and leave.
*853 In his motion to suppress, the defendant asserts that there was no probable cause to stop the truck and search it. He also presents several other theories to justify suppression of the evidence. Each of these arguments will be treated below.
CONCLUSIONS
1. Probable Cause to Stop and Search the Truck and to Seize the Marijuana, Currency and Papers.
Later that evening, Angel was overheard discussing the quality of narcotics with someone from the grocery store. Before the second meeting, the defendant demanded that Angel bring him "something^” Angel met with another member of his drug operation and picked up a plastic bag. When Angel drove to the location where he was to meet the defendant, he did not simply give him the plastic bag but instead directed the defendant to a remote location near the Henry Hudson Parkway. It seems probable that if the defendant were only arranging to sell wine, such elaborate measures would not be necessary.
With this background, Smith’s interpretation of the January 29 and 31 conversations between the defendant and Angel was entirely reasonable. These conversations, and the DEA’s surveillance on February 1, 1991, when the defendant was seen loading a cardboard box into his truck, gave the agents probable cause to believe that the defendant intended to sell drugs to Angel and that the drugs would be found in the Blazer. Because no warrant was needed the presence of probable cause justified the stop of the truck and the search for narcotics. (People v Blasich, 73 NY2d 673, 681 [1989].) Because the agents did not know what drug was involved, what amount was being delivered or how it was packaged, they could not anticipate where in the truck the drugs were placed. Accordingly, their search of the entire truck and the containers in it was appropriate. (United States v Ross, 456 US 798, 824 [1982]; People v Langen, 60 NY2d 170 [1983], cert denied 465 US 1028 [1984].) Once the agents found narcotics of any kind, it was lawful for them to seize it.
It is, however, a different story with respect to the $70,000 in currency found in the leather bag. The justification to search the truck for narcotics did not give the agents justification to seize everything found in the truck. If a proper warrantless search for specific items discloses other items that immediately appear to be incriminating, judged by the proba *854 ble cause standard, those items may also be seized.[1] (Arizona v Hicks, 480 US 321, 326-327 [1987]; Texas v Brown, 460 US 730, 741-742 [1983]; People v Roth, 66 NY2d 688, 690 [1985]; People v Basilicato, 64 NY2d 103, 115 [1984].) Here, there was no probable cause to connect the currency to the drug deal the agents suspected was about to take place or to any other criminal conduct. By their own interpretation of the information upon which they relied, the agents believed the defendant was going to deliver the drugs, not money. Defendant spoke of "ten things” and said "to bring something, whatever you can bring.” The explanation of these comments given by the agents was that the buyer needed to pay the defendant. Consequently, the defendant could have been expected to receive money at the delivery, but not to bring large amounts of currency with him. Furthermore, the information upon which the agents relied gave no indication of any other transaction involving the defendant so as to have explained the presence of the money in such a way as to give probable cause to believe the money was evidence of a crime. Currency is not contraband or a weapon and possession of money, even large amounts, is not evidence of crime without some connection of the money to criminal activity.
2. The Legality of Defendant’s Arrest.
The defendant claims, inter alla, that his arrest was unlawful, and that the search of the truck was, as a consequence, unlawful. This claim is based on the conduct of the agents as they arrested the defendant, including the fabrication of the reason for the arrest. When they pulled the defendant from his vehicle, the agents lied to him and told him he was a suspect in a bank robbery. Although the agents never formally arrested him, there was no doubt defendant was in custody. He was dragged from his car by the armed agents who handcuffed him, put him face down on the ground, and later interrogated him. The court will treat this deteiition as if it were an arrest. (See, e.g., People v Yukl, 25 NY2d 585, 589 [1969], cert denied 400 US 851 [1970].)
*855 Defendant relies on CPL 140.15, which prescribes police behavior when executing a warrantless arrest, as the basis for his claim. It provides in pertinent part: "[t]he arresting police officer must inform such person of his authority and purpose and of the reason for such arrest unless he encounters physical resistance, flight or other factors rendering such procedure impractical.” (CPL 140.15 [2].)
CPL 140.15 (2) is derived from former Code of Criminal Procedure § 180. That earlier provision required that when a warrantless arrest was made, the defendant was to be advised of the authority of the arresting officer and the reason for the arrest except when the defendant was arrested in the actual commission of the crime or pursued after an escape. In Squadrito v Griebsch (1 NY2d 471, 474 [1956]), where the defendant was arrested en route to sell stolen jewels that were in the pockets of his codefendant, the Court of Appeals applied the course of crime exception of section 180, writing: "This exception, highly logical, was inserted for a very good reason. When a person is apprehended 'in the actual commission’ of a crime, there is, of course, no need to acquaint him with the cause of his arrest. The reasonable and necessary assumption, and the assumption on the basis of which the Legislature undoubtedly acted, is that the offender caught in the act is fully aware of what he is doing and why he is being taken into custody.” In People v Coffey (12 NY2d 443, 453 [1963], cert denied 376 US 916 [1964]), where the defendant was arrested for driving at a high rate of speed, the court found the circumstances gave the defendant notice of the reasons for the arrest, the question left open was whether in other circumstances the failure to give notice invalidated the arrest.
When the notice provision was placed in the Criminal Procedure Law, the exception to the requirement of notice for arrests made in the course of a crime was eliminated and the current ones for resistance, flight, and impracticability were added. The revisers give no explanation of the change. (See, Temporary Commn on Rev of Penal Law and Crim Code, Proposed New York Criminal Procedure Law [1967, 1968, 1969]; Governor’s Bill Jacket, L 1970, ch 996.) Principles of statutory construction require that the omission of the course of crime exception in this unambiguous statute was an intentional elimination by the Legislature. (McKinney’s Cons Laws of NY, Book 1, Statutes §§ 74, 76, 94.) Even if it is possible to draw from Coffey and Squadrito (supra) and to imply an independent common-law exception to CPL 140.15 (2), such an *856 exception does not apply here. The agents deliberately fabricated the notice of their purpose and reason for the defendant’s arrest. Any implied notice that might be derived from the circumstances was thereby negated. Whatever the defendant knew about his own activity, that knowledge could not provide an explanation to the defendant of the basis for the detention after the agents told him he was a robbery suspect. Further, there was no effort by the People to bring the agents’ conduct within the current exceptions to the notice requirement and they are not considered. (See, People v Nieves, 67 NY2d 125, 135-136 [1986].) Accordingly, the defendant’s arrest was unlawful under New York law. The fruits of the unlawful arrest must be suppressed. The court finds that conversations between defendant and others about the events of February 1, 1991, which Agent Smith set out in the appendix C, are the fruits of the unlawful arrest and the tapes and contents of those conversations cannot be used by the People.
3. The Impact of the Arrest on the Stop, Search and Seizure of the Truck.
Defendant claims that the illegality of the arrest makes the stop and search of the truck and the wallet, and the seizure of the drugs unlawful. To sustain this claim, defendant relies on the "nexus” theory articulated in People v Belton (55 NY2d 49 [1982]). In Belton, the defendant and three others were in a car stopped for a traffic violation. After the stop, the police officer smelled marihuana and found on the floor of the car an envelope of the type used in sale of marihuana. The officers found marihuana in the envelope and arrested the four people. The officers then searched the passenger compartment of the car and defendant’s jacket found in that part of the car. Marihuana was found in the jacket. The Court of Appeals held that (supra, at 55-56): "[A] valid arrest for a crime authorizes a warrantless search * * * of a vehicle and of a closed container visible in the passenger compartment of the vehicle which the arrested person is driving * * * when the circumstances give reason to believe that the vehicle or its visible contents may be related to the crime for which the arrest is being made * * * or there is reason to believe that a weapon may be discovered or access to means of escape thwarted.” The court again relied on the nexus theory in People v Langen (60 NY2d, supra, at 181), and sustained a search of a closed container found in the vehicle where there was "both probable cause to search the automobile generally *857 and a nexus between the probable cause to search and the crime for which the arrest [was] being made.”
In People v Blasich (73 NY2d 673 [1989]), the court explained that it is the Belton search that requires the nexus between the crime of arrest and the basis for the search. The Belton nexus is important only in cases in which the circumstances of the arrest, including the reasons for it and the crime that is charged, are necessary to establish probable cause for the search of the vehicle as well as the arrest. (See, e.g., People v Tyson, 160 AD2d 826, 827 [2d Dept 1990]; People v Ianniello, 156 AD2d 469, 470 [2d Dept 1989], lv denied 75 NY2d 920 [1990]; People v Brown, 151 AD2d 199.)[2] Belton (supra), however, has nothing to do with those cases in which probable cause to search an auto does not come from the circumstances of the arrest of the defendant, but from other sources such as informers, citizens, victims, police observations, or wiretaps. In such instances the probable cause to search the vehicle may arise before or independently from circumstances justifying an arrest. (E.g., People v Ellis, 62 NY2d 393 [1984] [the search of the car based on probable cause disclosed the information justifying the arrest of the defendant]; People v Hines, 155 AD2d 722 [3d Dept 1989], lv denied 76 NY2d 736 [1990].)
Further, probable cause to arrest a person and probable cause to search a vehicle may be separately justified by the same information obtained before either the arrest or the search. In such circumstances, the search of the vehicle would not be dependent on the legality of the arrest. (Chambers v Maroney, 399 US 42, 48 [1970]; People v Brown, 28 NY2d 282, 285 [1971].) This power to search a vehicle independently of the arrest of driver or occupant has been expressly articulated in United States Supreme Court decisions: "The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law.” (Carroll v United States, 267 US 132, 158-159 [1925]; Chambers v Maroney, 399 US, at 48; see, United States v Ponce, 947 F2d 646 [2d Cir].) The distinction has been impliedly used in New York cases. (People v John BB., 56 NY2d 482, cert denied 459 US 1010 [1982]; *858 People v Milerson, 51 NY2d 919, 920-921 [1980]; People v Singletary, 35 NY2d 528 [1974]; People v Brown, 28 NY2d 282; see, People v Rossi, 177 AD2d 303 [1st Dept]; Kamins, New York Search & Seizure, at 218 [1991].)
In this case, the independent basis for the search of the truck came from the wiretaps of phones other than the defendant’s, and the police surveillance of the defendant and his truck. When the police stopped the truck on the Henry Hudson Parkway, and searched it, as already held, they had probable cause to believe thát narcotic drugs were in the truck. The illegality of defendant’s detention had no effect on the legality of the stop and search of the truck.
4. The Absence of a Warrant.
The defendant next claims that the stop and search of the truck and the seizure of the marihuana were unlawful because they were not conducted with a warrant. The law is clear that a moving vehicle can be stopped and searched without a warrant as long as there is at least reasonable suspicion to stop it (Delaware v Prouse, 440 US 648 [1979]; People v Sobotker, 43 NY2d 559 [1978]), and probable cause to search it based on the belief that the vehicle contains contraband, a weapon, or evidence of a crime. (California v Carney, 471 US 386 [1985]; People v Blasich, 73 NY2d, at 681.) No warrant is needed because vehicles are mobile and their users have a reduced expectation of privacy in them. (Carroll v United States, 267 US, at 153, supra; People v Langen, 60 NY2d, at 180-181, supra; People v Belton, 55 NY2d, at 53, supra.)
Defendant claims that the moving vehicle exception does not apply because the agents had at least 10 Vi hours to obtain a warrant to search the truck. He claims that if there was probable cause to believe there were drugs in the car, there was such knowledge sufficiently in advance of defendant’s departure for his trip to obtain a warrant.
The record shows that arrangements for the meeting were made by telephone on January 31 at 11:25 p.m. and that the meeting was to be held on February 1 at 11:00 a.m. at a prearranged site undisclosed in the conversation. On February 1, 1991, the agents placed defendant under surveillance and followed him.
However, the wiretap evidence alone did not provide sufficient probable cause to obtain a warrant. Because the *859 agents did not have control over the events, they did not know before their observations on the morning of February 1 where the drugs were located (at defendant’s home, at the liquor store, or in the truck), how the drugs would be packaged, how the defendant would get to the location of the sale or where the sale would take place. Although the prior surveillance could provide some suspicion about these things, there was insufficient information for an anticipatory warrant (People v Glen, 30 NY2d 252 [1972]), and it was only the surveillance on February 1, 1991, that supplied probable cause to believe that the narcotics were in a specific place, the truck. Thus, no warrant could be obtained just before the truck began to move, a point in time too late to apply for a warrant.
The defendant also claims that a warrant should have been obtained for a search of the container. The right to search the truck without a warrant includes any closed container found inside the truck that might contain the subject of the search. (United States v Ross, 456 US 798; People v Langen, 60 NY2d, at 172, supra.) Under Langen, there was one remaining exception to the permissible warrantless search of an automobile and its contents: a warrant was needed to search a container in an automobile when that container was the focus of the probable cause. The exception comes from Arkansas v Sanders (442 US 753 [1979]), and United States v Chadwick (433 US 1 [1977]), both of which held unlawful the seizure without a warrant of a piece of luggage when it was the focus of the probable cause, but was subsequently placed in a vehicle. Sanders and Chadwick were overruled in California v Acevedo (500 US —, 111 S Ct 1982 [1991]). Acevedo permits, under the Federal Constitution, a search of the entire vehicle including all containers when there is probable cause to believe contraband is in the car. The decision of the First Department in People v Etheridge (175 AD2d 739 [1991]) follows Acevedo. This court is bound by that decision.
However, the record in this case shows that probable cause did not focus on any particular container in the car. As earlier noted, the agents did not know what kind of drug was involved until the search was conducted. Although they observed the defendant carrying a large brown box to the car, there was no probable cause to believe that whatever defendant was carrying would be placed only in the box or in the box at all because they did not know what substance was involved. Accordingly, Langen (supra) applies to allow a search of the entire car and all containers without a warrant.
*860 The currency, the information from the papers, and the discussions of the February 1, 1991 events are suppressed; the marihuana is admissible.

. This "plain view” theory has three factors: (1) inadvertent discovery in the course of a (2) legal search (3) of immediately incriminating items. (People v Jackson, 41 NY2d 146 [1976].) In Horton v California (496 US 128 [1990]), the Supreme Court eliminated the requirement of inadvertent discovery. It is unclear whether New York will follow Horton. (People v Manganaro, 176 AD2d 354 [2d Dept 1991]; People v Aaron, 172 AD2d 842 [2d Dept 1991].) However, in this case the discovery of the currency was inadvertent, and, in any event, inadvertence is not the relevant factor.

. Generally, the circumstances of a traffic offense will not give rise to probable cause to search a vehicle. (People v Marsh, 20 NY2d 98, 100 [1967]; People v Mercado, 165 AD2d 910, 912 [3d Dept], lv denied 76 NY2d 988 [1990].)