THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* CHARLES RICHARDS, Defendant-Appellee.

Third District    No. 80-511

Opinion filed December 31, 1981.—Modified opinion filed March 25, 1982.

John A. Barra, State's Attorney, of Peoria (John X. Breslin, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Theresa J. Rahe, of Peoria, for appellee.

JUSTICE BARRY delivered the opinion of the court:
The State appeals from the order of the Circuit Court of Peoria

County suppressing the evidence gathered pursuant to a second examination of the defendant's, Charles Richards', possessions. The items, including a necklace which was found within the defendant's clothing, had been previously seized from the defendant's person and placed in a manila envelope following a lawful inventory search incident to the defendant's incarceration for violation of work-release rules, an offense unrelated to the instant burglary offense. The issue is whether the defendant retained a legitimate expectation of privacy in items taken from his person and held by the police pursuant to a lawful inventory search so as to render a subsequent warrantless inspection a violation of his fourth and fourteenth amendment rights.

The defendant was indicted for the January 12, 1980, burglary of a Peoria County residence. Prior to trial, he moved to suppress evidence of the necklace that had been in his possession and evidence of a subsequent incriminating statement. The testimony adduced at the suppression hearing established the following facts.

Detective Robert Lucas of the Peoria Heights Police Department had been investigating a January 12, 1980, burglary of the residence owned by Mr. and Mrs. Mullen. Included as one of the several stolen items was Mrs. Mullen's necklace, made from a silver dollar. In the course of his investigation, Lucas discovered that the defendant, who had applied for employment at Mullen's Gasoline Service Station, and Harold J. Ramsey, who had visited Mullen's house previously, both lived at the Peoria County Work Release Center. Lucas contacted the Center on January 16, and learned that both men had been observed leaving together the morning of the burglary. Lucas also learned that the defendant had violated the rules of the work-release center and had been placed in the custody of the Tazewell County jail because of an overflow at the Peoria County jail. The record does not reveal on what date the defendant entered the jail.

During the defendant's prelockup processing for violation of the work-release rules, the police at the Tazewell County jail searched and inventoried all of the defendant's personal effects, pursuant to their standard procedure. These items were placed in a manila envelope and remained secured outside of the presence of the defendant. On January 17, 1980, prior to going to the Tazewell County jail to inspect the personal effects of the defendant, Lucas telephoned the jail and learned that a necklace found among the defendant's effects matched the description of the necklace taken in the burglary. Lucas, accompanied by Mrs. Mullen, went to the jail. The necklace was removed from the closed envelope, and Lucas showed it to Mrs. Mullen. Mrs. Mullen identified the uniquely crafted necklace as a piece of jewelry taken from her home.

After Mrs. Mullen identified the necklace, Lucas spoke alone with the

defendant in an interrogation room. Lucas then advised the defendant of his *Miranda* rights and showed the necklace to him. The defendant initially denied any knowledge of the burglary; but after Lucas informed him that the necklace had been found among his personal effects, the defendant made an oral, then a written, statement confessing to the January 12 burglary of the Mullen residence.

The circuit court upheld the lawfulness of the original inventory, but ruled that the second examination constituted a search governed by the fourth amendment. Because the search was conducted without a warrant and no exception to the warrant requirement applied, it was found unlawful. Accordingly, the court suppressed both the necklace and the defendant's confession, observing that:

> "The right of privacy as to one's personal effects is not to be taken lightly whether an ordinary citizen or one charged with an offense. An open house, as to such items, for police officers of any and every agency as to any and all charges is violative of Fourth Amendment rights."

Before proceeding to the issue raised on appeal, we emphasize that neither party has challenged the legality of the inventory search performed pursuant to standard police practices. "[L]ittle doubt has ever been expressed about the validity or reasonableness of such searches incident to incarceration." (*United States v. Edwards* (1974), 415 U.S. 800, 805 n.6, 39 L. Ed. 2d 771, 776 n.6, 94 S. Ct. 1234, 1238 n.6.) Today we examine solely the propriety of the "second look" of the fruits of the lawful inventory search by officers from a law enforcement agency other than that involved in the inventory, and which search was made for the purpose of determining whether the fruits included probative evidence pertaining to an offense other than that for which the defendant was incarcerated.

Our fundamental inquiry in fourth amendment controversies is whether the search or seizure was reasonable under all circumstances. (*People v. Bayles* (1980), 82 Ill. 2d 128, 411 N.E.2d 1346.) In order to invoke this protection, however, the aggrieved person must demonstrate an unreasonable governmental intrusion into his legitimate expectations of privacy. (*United States v. Chadwick* (1977), 433 U.S. 1, 53 L. Ed. 2d 538, 97 S. Ct. 2476.) For the defendant in this case to prevail on appeal, we must first conclude that he retained a legitimate expectation of privacy in the necklace after he had surrendered it to the police for safekeeping and after they had secured it in the jailhouse. The defendant argues that when the defendant's personal effects are sorted by the jailer and those items, not then considered contraband or evidence of the offense for which the accused was incarcerated, are secured, the defendant retains a legitimate expectation of privacy in those effects which is constitutionally protected

from warrantless "second looks" by police from another agency who are investigating a different offense. For the reasons hereinafter stated, we agree with the defendant's position.

Because the precise issue that we decide today has not previously been addressed by reviewing courts in Illinois, we initially review related precedent from this court and other jurisdictions.

In *United States v. Edwards* (1974), 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234, the defendant was arrested late at night and charged with attempted breaking and entering. He was taken to the local jail, his possessions other than the clothes he wore were inventoried, and he was placed in a cell. Shortly thereafter, an investigation at the scene of the crime revealed that the attempted breakin caused several paint chips from the window sill to scatter. The defendant, who still wore his own clothing, was ordered to remove his clothing, which was then examined. Police found paint chips identical to those discovered on the window sill. The defendant objected to the admission of such evidence on the ground that the seizure of his clothes was without a warrant. The district court denied the motion to suppress, but the court of appeals reversed, saying that a warrantless seizure of the clothing carried out "after the administrative process and the mechanics of the arrest have come to a halt" was nonetheless a violation of the defendant's fourth amendment rights. (*United States v. Edwards* (6th Cir. 1973), 474 F.2d 1206, 1211.) The Supreme Court, in a 5-4 decision, reversed. The majority agreed that the initial arrest and incarceration were valid, but found that the warrant clause of the fourth amendment was inapplicable in those circumstances. According to the majority opinion, a defendant's clothing may be searched even where a significant period of time has elapsed since the incarceration, or where the clothing or personal effects are immediately seized upon arrival at the jail and are later searched and used at a subsequent criminal trial. The majority reasoned that the legal arrest substantially diminished the accused's legitimate expectations of privacy in his person and clothing. These expectations were thus overriden by countervailing police interest in weapons, means of escape and evidence of crime. (*United States v. DeLeo* (1st Cir. 1970), 422 F.2d 487.) The majority cautioned, however, that merely because the warrant requirement was inapplicable does not leave police subject to no constitutional constraints, for the second look " 'must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures.' " (*United States v. Edwards* (1974), 415 U.S. 800, 808 n.9, 39 L. Ed. 2d 771, 778 n.9, 94 S. Ct. 1234, 1239 n.9, citing *Terry v. Ohio* (1968), 392 U.S. 1, 20, 20 L. Ed. 2d 889, 905, 88 S. Ct. 1868, 1879.) Because the defendant conceded on appeal that the police had probable cause to take a second look at the defendant's clothing that morning, the *Edwards*

majority chose not to discuss the sufficiency of the reasonableness needed to sustain a second look where no probable cause existed.

Subsequently, *Edwards* has been used to justify "second looks" in situations similar to the case at bar. For example, in *United States v. Jenkins* (2d Cir. 1974), 496 F.2d 57, the accused's money was inventoried for safekeeping following his arrest for a traffic violation. Less than one week later, a second inspection of the money by a Federal agent revealed that the serial numbers of those bills coincided with marked bills stolen in a recent robbery. The court rejected the defendant's argument that *Edwards* was inapplicable because the second look was for the purpose of obtaining evidence of a different crime than that for which the arrest was made. The court concluded that a second look fails to violate the fourth amendment because no intrusion into an area where the owner could any longer reasonably expect privacy occurs. In fact, the holding of *Edwards* has been interpreted to mean:

> "[T]hat at least when (i) an object lawfully came into plain view at the time of a search upon the arrestee's arrival at the place of detention, (ii) later investigation establishes that this item is of evidentiary value, and (iii) the item remains in police custody as part of the arrestee's inventoried property, then it is permissible for the police, without a warrant, to retrieve that object and thereafter deal with it as an item of evidence." (2 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment §5.3(b), at 315 (1978).)

*United States v. Phillips* (8th Cir. 1979), 607 F.2d 808; *United States v. Oaxaca* (9th Cir. 1978), 569 F.2d 518; *United States v. Grill* (5th Cir. 1973), 484 F.2d 990; *State v. Nesmith* (1979), 40 N.C. App. 748, 253 S.E.2d 594; *People v. Rivard* (1975), 59 Mich. App. 530, 230 N.W.2d 6.

The State urges us to extend the reasoning of *Edwards*, and those cases wherein *Edwards* has been used to justify "second look" searches, to the facts of this case. Review of related precedent from Illinois, however, convinces us otherwise. This court has recently held that the contents of an arrestee's closed purse may not be searched and its contents seized as a search incident to an arrest for an unrelated offense or as a permissible extension of the inventory exception unless exigent circumstances have been shown or a warrant issued. *People v. LaFayette* (1981), 99 Ill. App. 3d 830, 425 N.E.2d 1383, *appeal denied* (1982), ___ Ill. 2d ___.

The rationale upon which our opinion in *LaFayette* was based applies equally to the facts in the instant case. We are unconvinced by the argument presented by the State that the warrantless search in this case is not affected by the fourth amendment because of the fact that here, unlike in *LaFayette*, the container (a manila envelope) was provided by

the inventorying officer, rather than by the defendant himself, for the purpose of securing items removed from the defendant's immediate possession at the prelockup processing.

In *LaFayette* we stated that while a prisoner suffers a substantial diminution in his person once he is placed under arrest, he retains a reasonable expectation of privacy in the possessions which were within his immediate control upon his arrest. Whether those possessions are removed from the prisoner's purse for "inventory" purposes or removed from an envelope containing previously inventoried items for viewing by an officer investigating an unrelated offense and a member of the general public, as in this case, is inconsequential for purposes of the fourth amendment protection against unreasonable searches and seizures.

The fact that, in the instant case, the defendant's personal effects were shown not only to a law enforcement officer, but to a member of the general public as well, makes this case factually distinguishable from *Jenkins*. If, as the State suggests on the authority of *Jenkins*, an officer from a different law enforcement agency—Lucas in this case—may take a warrantless second look because the defendant has no reasonable expectation of privacy in inventoried personal effects, then we foresee no reason why those personal effects may not be exposed to view by the general public—Mrs. Mullen in this case. Obviously, were we to adopt the State's argument, we would be setting dangerous precedent dissipating fourth amendment protections with respect to police as well as private investigations of offenses unrelated to those for which a prisoner stands accused. We, therefore, reject the State's reasoning, based on the opinion of the Second Circuit Court of Appeals in *Jenkins*, that a prisoner retains no reasonable expectation of privacy in personal effects exposed to police view during routine inventory searches.

In a case factually similar to the one we consider today, the Fifth Circuit Court of Appeals observed as follows:

"The fact that the police have custody of a prisoner's property for the purpose of protecting it while he is incarcerated does not alone constitute a basis for an exception to the requirement of a search warrant. *Preston v. United States*, 376 U.S. 364, 84 S. Ct. 881, 11 L. Ed. 2d 777 (1964); *Barnett v. United States, supra; Williams v. United States, supra*. Of course, property in police custody may be subject to warrantless searches under exceptions springing from reasons other than custody alone. The focus in Fourth Amendment cases today is on privacy rather than on property rights. *E.g. Katz v. United States*, 389 U.S. 347, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967). *Warden, Maryland Penitentiary v. Hayden, supra*.

We are not prepared to say that an accused whose effects are held by the police for safekeeping has, by the single fact alone of

the police custody of the property, surrendered his expectations of the privacy of those effects." *Brett v. United States* (5th Cir. 1969), 412 F.2d 401, 406.

Here, as in *Brett*, the State has not borne its burden of showing that the search fell within any of the exceptions to the warrant requirement of the fourth amendment.

Lucas' search of the contents of the manila envelope on January 17 was not incident to an arrest, because it was not even close to being contemporaneous with Richards' arrest. Nor was the necklace—apparently extracted from a pocket in the defendant's clothes—in "plain view," since the officer taking the second look for an unrelated offense was from a law agency other than that which had custody of the defendant and his effects. Furthermore, the necklace had to be removed from a closed envelope for viewing. The State argues that the second look is permissible without a warrant because the defendant has no legitimate expectation of privacy in goods seized as a result of an inventory conducted according to standard police procedure. We refuse to extend the limited inventory exception or adopt the State's theory that such second looks are not searches for purposes of the fourth amendment.

The purposes for which inventories are permissible are:

"1. to safeguard the property of a prisoner from loss by theft during his incarceration.

2. to protect the police from unfounded charges of theft from prisoners.

3. to protect the lives of prisoners and guards from assaults by prisoners with the use of weapons carried in." *Farrie v. State* (1971), 255 Ind. 681, 685, 266 N.E.2d 212, 215 (DeBruler, J., dissenting).

Once the prisoner's effects are placed in storage, it is obvious that none of the above purposes would be served by allowing warrantless second looks at them.

Further, here, Lucas did not attempt to obtain the defendant's consent prior to showing the necklace to Mrs. Mullen. Thus, the State may not contend that the defendant, by his own affirmative act, permitted Lucas to proceed without a warrant.

Finally, the State does not attempt to bring the present case within the "exigent circumstances" exception. There was unquestionably ample opportunity for Lucas to apply for a search warrant, and to submit to a neutral magistrate the evidence which Lucas believed sufficient to justify his search of the defendant's stored possessions. On these facts, we refuse to expose an accused's possessions to public view without first requiring that a warrant be obtained. In a case such as this, "the need for effective law enforcement is not satisfied as against the right of privacy by any

necessity for the officer to take the decision into his own hands." *Rent v. United States* (5th Cir. 1954), 209 F.2d 893, 899; see also *United States v. Edwards* (1974), 415 U.S. 800, 811, 39 L. Ed. 2d 771, 780, 94 S. Ct. 1234, 1241 (Stewart, J., dissenting).

Accordingly, we hold that the trial court's order of suppression, based on the fact that a law enforcement agency other than that which had custody of the defendant conducted a warrantless search of the defendant's possessions in the investigation of an offense other than that for which the defendant was arrested, was proper.

Affirmed.

SCOTT, P. J., and STOUDER, J., concur.