**STATE of Tennessee, Appellant,**

v.

**Moses COURY and Kennon Laird, Appellees.**

Court of Criminal Appeals of Tennessee, at Nashville.

Jan. 11, 1983.

Permission to Appeal Denied by Supreme Court April 4, 1983.

Jerry L. Smith, Asst. Atty. Gen., Nashville, Joseph D. Baugh, Jr., Asst. Dist. Atty. Gen., Franklin, for appellant.

Lionel Barrett, Nashville, for appellee Coury.

Donald P. Harris, Franklin, for appellant Laird.

## OPINION

DAUGHTREY, Judge.

This appeal was initiated by the state, seeking interlocutory review of the trial court's order suppressing certain evidence seized by Williamson County authorities for use against the defendants on a charge of assault from ambush. Because we find that the exclusionary rule was improperly applied, we reverse the order of suppression and remand the case for further proceedings.

Sheriff Flemming Williams began his investigation in this case on June 15, 1981, when he received a report that late that afternoon Mr. William Wilson had been shot in the abdomen and had been taken to a Nashville hospital. Wilson was ambushed at the rear of his rural Williamson County home. Officers at the scene found a folding lawn chair pushed up underneath a window inside Wilson's barn and partial footprints and five .45 shells at the base of the chair. They also found .45 bullets embedded in the back of Wilson's house.

Sheriff Williams and other investigators from his office talked to several of Wilson's neighbors, who had seen an unfamiliar green pickup truck with Arizona license tags parked near the driveway to Wilson's house on June 14, the night before the shooting. The truck, occupied at that time by two men, was out of fuel, and two of Wilson's neighbors assisted the strangers in securing gasoline. The same green pickup was seen parked in the immediate vicinity the next day, at about the time the shooting occurred. Another neighbor, Wink Brown, had spoken to the lone occupant of the vehicle, who said that he was from Mesa, Arizona, and had driven east because of domestic problems. After his conversation with the man in the green pickup, Mr. Brown wrote down a complete description of the truck, including its Arizona license number. Brown also gave Williams a description of the man with whom he had spoken; this description was later found to match the physical appearance of defendant Coury.

Based on the information he had gathered, Sheriff Williams sent an all-points bulletin on the green pickup truck and its two occupants to law enforcement agencies along Interstate I–40 west from Nashville to Phoenix, Arizona. This bulletin was received in Okmulgee County, Oklahoma, sometime after 2:00 a.m. on June 16. Two hours later the green pickup truck was stopped on I–40 by Okmulgee County officers and its two occupants questioned and released. When law enforcement authorities there realized that the two men and the truck met the description broadcast by Tennessee officials, a search for the vehicle was immediately begun. The truck was located and its occupants (the defendants in this case) were taken into custody at an Okmulgee County garage, where they had stopped to have the alternator replaced. At the time of his arrest, defendant Coury was carrying a blue-green suitcase which was confiscated by Oklahoma officers and taken to the property room at police headquarters.

Sheriff Williams arrived in Oklahoma the next day, June 17, and immediately secured a search warrant for the green pickup truck from an Okmulgee magistrate. Certain items he found in the truck indicated that the occupants had recently been in Nashville. He seized these items, as well as the truck's license tag.

The sheriff also searched the blue-green suitcase being held at the police station, looking specifically but unsuccessfully for the .45 automatic weapon that was described in the search warrant. The suitcase itself was not explicitly covered by the warrant.

Sometime after Sheriff Williams returned to Tennessee, he learned that further investigation had turned up evidence of fibers on the folding chair from which the ambush had apparently occurred. He went back to Oklahoma on July 7 and secured a search warrant for the blue-green suitcase and its contents, so that fiber analysis could be made of the defendants' clothes. The clothes in the suitcase were brought back to Tennessee and subsequently forwarded to the FBI for comparison.

The defendants waived extradition and were brought to Tennessee, where an indictment was returned against them. They then sought to suppress items seized in Oklahoma as a result of the searches on June 17 and July 7. The trial court held that Sheriff Williams's search of the suitcase on June 17 was invalid, and that this illegality tainted the subsequent search on July 7, making it similarly invalid. The trial court thus suppressed all items seized from the suitcase on July 7.

On appeal from this ruling, the state initially asserts that defendant Laird lacks standing to challenge the search of what the proof showed to be a suitcase belonging to defendant Coury. Laird conceded at the suppression hearing that he had no possessory interest in the suitcase and had merely asked Coury if he could put some clothes in it. There is no indication in the record that Laird expected the contents of the suitcase to be kept private, or that he had any right to prevent others from having access to the suitcase. Indeed, at one point he testified that while he was in jail in Oklahoma he had asked a deputy to bring him a change of clothes from the suitcase, conduct which hardly evinces an expectation that the contents of the suitcase would remain private.

■ We conclude that the question of Laird's "standing"[1] to contest the seizure of the contents of the suitcase is controlled by *Rawlings v. Kentucky*, 448 U.S. 98, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980). There the United States Supreme Court held that mere ownership of items seized from a purse belonging to another person was not sufficient to establish a legitimate privacy interest in the other person's purse. Under the rule in *Rawlings*, we likewise conclude that a person who puts a few items of clothing into a companion's suitcase, without more, has failed to establish a legitimate expectation of privacy in that suitcase. For this reason, Laird's motion to suppress should have been denied by the trial court.

■ However, if we accept Laird's unrebutted testimony as proof of Coury's ownership of the suitcase (Coury did not testify at the suppression hearing), the question of Coury's "standing" must be resolved to the contrary, especially given the fact that Coury was shown to have been outside the truck carrying the suitcase at the time of his arrest. Although it is arguable that Coury's immediate possession of the suitcase made it subject to a valid search incident to his arrest,[2] this question is a close one when viewed in light of the rule announced in *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

In *Chadwick*, the defendants had carried a locked footlocker from the inside of a train depot to a waiting car and put it in the trunk. Before they could close the trunk or start the car, they were arrested and the footlocker was seized. FBI agents took the footlocker to headquarters and opened it without obtaining the defendants' consent or securing a search warrant. The *Chadwick* court concluded:

> Warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the "search is remote in time or place from the arrest" . . . or no exigency exists. Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no

---

1. The United States Supreme Court purportedly has replaced the standing requirement with an inquiry into the existence of a challenger's legitimate expectation of privacy into the search area. *Rakas v. Illinois*, 439 U.S. 128, 139–140, 99 S.Ct. 421, 428–429, 58 L.Ed.2d 387 (1978). While the substance of the threshold question has been changed, *see, e.g., Rakas, supra; United States v. Salvucci*, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980), the courts have been reluctant to give up use of the term "standing" to denote the inquiry itself. *See, e.g., State v. Roberge*, 642 S.W.2d 716 (Tenn. Dec. 6, 1982).

2. *See, e.g., Savoie v. State*, 422 So.2d 308, 32 Cr.L. 2212 (Fla.1982), extending the search-incident rule to any container carried by the arrestee at the time of his arrest, by analogy to *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest.

*Id.,* at 15, 97 S.Ct. at 2485.

Under a strict application of the rule in *Chadwick,* Sheriff Williams's June 17 warrantless inspection of the contents of Coury's suitcase cannot be said to have constituted a lawful search. This conclusion, however, does not answer the question of whether the subsequent search on July 7 was rendered illegal by the invalid search conducted on June 17. The defendants claim that the second search was somehow tainted by the first, under *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed.2d 319 (1920) (origin of the "fruit of the poisonous tree" doctrine). The state responds that there was sufficient "attenuation" between the two to save the second search, under *United States v. Ceccolini,* 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) (testimony of *live* eyewitnesses held sufficiently attenuated from initial illegality).

▮ Assuming that the June 17 search was in fact illegal, and further assuming that the July 7 search was somehow connected to it, we conclude that the items seized from the suitcase during the second search are admissible in evidence under the inevitable discovery doctrine. Under this doctrine, the exclusionary rule is inapplicable if the prosecution can establish "first, that certain proper and predictable investigatory procedures would have been utilized in the case at bar, and second, that those procedures would have inevitably resulted in the discovery of the evidence in question." *Stokes v. State,* 423 A.2d 552, 556 (Md.App.1980), quoting LaCount and Grese, *The "Inevitable Discovery" Rule, an Evolv-*

*ing Exception to the Constitutional Exclusionary Rule,* 40 Alb.L.Rev. 483, 491 (1976). *See also* W. LaFave, 3 *Search and Seizure* § 11.4(a) (1978).

Although the United States Supreme Court has not yet adopted the inevitable discovery doctrine, it suggested the use of this exception in *Brewer v. Williams,* 430 U.S. 387, 406 n. 12, 97 S.Ct. 1232, 1243 n. 12, 51 L.Ed.2d 424 (1977).[3] The doctrine is widely used in the lower courts, 3 *Search and Seizure, supra,* § 11.4(a); *United States v. Brookins,* 614 F.2d 1037, 1044 (5th Cir. 1980), and has been employed in Tennessee courts. *See Howard v. State,* 599 S.W.2d 280, 283–284 (Tenn.Cr.App.1980).

In *Howard v. State, supra,* the defendant took some money from an apartment complex office, and two employees supplied the police with a description of the defendant and his car and with the car's license plate number. After being taken into custody through a possibly illegal arrest on an unrelated charge, the defendant was identified by the two employees. The defendant claimed that the identifications were the fruit of the illegal arrest and thus should be suppressed. The court held that the inevitable discovery doctrine would allow the introduction of the identification.

His [the defendant's] description had been given by two eye-witnesses, along with the license number of the automobile driven by the thief (which, it later developed, was registered to the defendant's sister). The conclusion is inescapable that this evidence, obtained independently of the challenged arrest, would have led police to Howard sooner or later.

*Id.*

In the present case, the sheriff first searched the suitcase in an effort to find the gun used in the shooting. It was not until later that the investigation revealed

**3.** On remand from the Supreme Court, the Iowa trial court applied the inevitable discovery doctrine. The resulting conviction was upheld in *State v. Williams,* 285 N.W.2d 248, 260 (Iowa 1979), *cert. denied,* 446 U.S. 921, 100 S.Ct. 1859, 64 L.Ed.2d 277 (1980). In a collateral proceeding the conviction was ultimately struck down, however, upon a finding that the

State had failed to show a lack of bad faith on the part of police officers. *Williams v. Nix,* 700 F.2d 1164 (8th Cir.1983). Since the release of the instant opinion, certiorari has been granted by the United States Supreme Court. *Nix v. Williams,* —— U.S. ——, 103 S.Ct. 2427, 77 L.Ed.2d 1315 (1983).

the presence of fibers on a chair at the scene of the crime and clothes worn by the defendants on the day of the shooting became relevant. Certainly, once the police discovered that they needed to find the defendants' clothes, the obvious place to look for them was in the suitcase defendant Coury was carrying when he was arrested. Common sense and "predictable investigatory procedures" would inexorably have led the police to search the suitcase on July 7 even if they had not searched it on June 17. Thus the inevitable discovery exception removes any taint connected with the July 7 search, and we conclude that the evidence obtained in that search should not have been suppressed.

We therefore hold that the trial court erred in suppressing the evidence seized from defendant Coury's suitcase on July 7. Nor do we find any basis for the suppression of a tire removed from the green pickup truck in compliance with a July 17 court order. The vehicle had been seized a month earlier pursuant to the original search warrant issued in Okmulgee County, and the defendants do not now dispute the state's contention that the removal order was therefore valid.

The judgment of the trial court is reversed, and the case is remanded for further proceedings.

 O'BRIEN and TATUM, JJ., concur.