**The PEOPLE of the State of Colorado, County of Boulder, Plaintiff-Appellant,**

v.

**Steven Lee BERTINE, Defendant-Appellee.**

**No. 84SA331.**

Supreme Court of Colorado, En Banc.

Sept. 30, 1985.

---

Alexander M. Hunter, Dist. Atty., John M. Haried, Richard F. Good, Deputy Dist. Attys., Boulder, for plaintiff-appellant.

David F. Vela, Colorado State Public Defender, Cary C. Lacklen, Deputy State Public Defender, Denver, for defendant-appellee.

ERICKSON, Justice.

The district attorney filed this interlocutory appeal after the district court granted a defense motion to suppress evidence seized from the defendant's backpack during an automobile inventory search. We affirm.

## I.

At approximately 12:50 a.m. on February 10, 1984, Officer Julius Toporek (Toporek) of the Boulder Police Department observed the defendant's older model panel truck traveling at a high rate of speed. Toporek followed the vehicle and saw the defendant change lanes several times without signalling. By following the defendant's vehicle and maintaining a constant distance, Toporek estimated the vehicle's speed at approximately fifty to fifty-five miles per hour. The posted speed limit was thirty miles per hour. Toporek then turned on his overhead lights and stopped the vehicle.

Toporek approached the vehicle and asked the driver, Steven Lee Bertine (defendant), for his driver's license and registration. The defendant and his dog were the only occupants in the vehicle. In talking to the defendant, Toporek detected a strong odor of an alcoholic beverage on the defendant's breath. He also noticed that the defendant's eyes were watery and glassy, and that the defendant's speech was slurred and somewhat dragged out. Based upon his observations, Toporek believed that the defendant was driving while under the influence of alcohol.

Toporek asked the defendant to perform a series of roadside sobriety tests. The defendant complied with the request and completed the tests. Toporek concluded, based on his observations, that defendant was intoxicated and advised the defendant that he was under arrest for an alcohol-related offense.

After taking the defendant into custody, Toporek asked Officer Reichenback (Reichenback), who had arrived as a backup officer, to impound the defendant's vehicle. Subsections 7–7–2(a)(1) and 7–7–2(a)(4) of the Boulder Revised Code authorize police officers to impound vehicles when drivers are taken into custody or when a vehicle obstructs traffic or creates a traffic hazard.[1] In the course of impounding the ve-

---

**1.** Section 7–7–2(a) provides in pertinent part:

> A peace officer is authorized to remove or cause to be removed a vehicle from any street, parking lot, or driveway when:

hicle, Reichenback radioed an animal control unit to remove the defendant's dog. After the dog was removed, Reichenback requested a tow truck.

Before the tow truck arrived, Reichenback made an inventory of the items found in the vehicle in accordance with Boulder police procedure,[2] and listed jumper cables, a tire, a shovel, and some sandbags. Reichenback also discovered a closed backpack directly behind the front seat and made a detailed inventory of the contents of the backpack. The officer first unzipped the main compartment where he found, among other items, a separate, zippered nylon bag. He then unzipped the nylon bag and found three tin cans and an "Irish Mocha Mint" coffee can, all secured with covers. The officer opened the coffee cans and found the contraband in issue. The property report documenting the contents of the backpack reflects that one of the tin cans contained cocaine paraphernalia, another contained bindles of cocaine, and the third contained $700 in cash, all in twenty-dollar bills. The coffee can contained more bindles of cocaine and a number of tablets in a zip-lock bag. After the inventory was completed, a private tow-truck company towed the defendant's vehicle to its impound lot.

Defendant asserted a number of grounds for suppression of the evidence seized in the inventory search. He argued that Toporek did not have sufficient grounds to make a stop, that there was no probable cause for his arrest, and that the impoundment and inventory were not conducted in accordance with standard procedure. He also claimed that the inventory was merely a pretext for a warrantless investigatory search. Finally, he asserted that the police officers exceeded the constitutional limits of a proper inventory search by examining the inside of the backpack, when the purposes for the search could have been achieved by less intrusive means, such as sealing the car doors with evidence tape or removing the backpack and listing it as one sealed unit.

Following the suppression hearing, the trial court found that the police had probable cause to make the initial stop, to administer the roadside sobriety tests, and to arrest the defendant. The trial court also found that the officers followed standard police procedures when they impounded the vehicle and conducted a detailed inventory search of its contents. The trial court rejected defendant's contentions that the police conducted the search in bad faith and that the inventory search was a pretext for an investigatory search.

In reviewing the scope of the search, the trial court relied on *Illinois v. Lafayette,*

---

(1) A vehicle is situated in a manner that obstructs the normal movement of traffic and the person in possession of the vehicle is not present or is unwilling or unable to provide for its immediate removal; [or]
....
(4) The driver of a vehicle is taken into custody by the police department....
Boulder Rev.Code §§ 7-7-2(a)(1), -2(a)(4) (1981).

**2.** Boulder Police Department directives specify:
A. Upon placing a motor vehicle in Police custody, Officers shall take the following steps in securing the vehicle and its contents:
1. If the vehicle or its contents have been used in the commission of a crime, or are themselves the fruit of a crime, the Officer shall conduct a *detailed* vehicle inspection and *inventory* and record it upon the VEHICLE IMPOUND FORM.
2. Personal items of value should be removed from the vehicle and subsequently placed into Property for safekeeping.

3. The Officer shall request a Tow Truck, and upon its arrival have the Tow Truck operator sign the IMPOUND FORM, keeping one copy in his possession, before the Officer releases the vehicle for impoundment in the City of Boulder impoundment facility.
General Procedure issued from the office of the Chief of Police, Boulder Police Department, Boulder, Colorado, concerning Motor Vehicle Impounds, effective September 7, 1977 (emphasis added).
The Boulder Police Department's directives provide officers with a number of alternatives when they arrest a motorist for serious violations of the motor vehicle code. Although the procedure followed in this case was officially authorized, the officer also had the option of either sealing the vehicle before it was towed away, or driving the vehicle to the nearest lot and locking it. The Boulder Police Department's regulations and rules do not require that an automobile be inventoried and searched in accordance with the procedures followed in this case.

462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), and concluded that the search was reasonable under the fourth amendment to the United States Constitution. However, because of *People v. Counterman*, 192 Colo. 152, 556 P.2d 481 (1976), the trial court held that the search violated article II, section 7 of the Colorado Constitution. It is from this ruling that the prosecution appeals.

## II.

The fourth amendment safeguards an individual from an unreasonable governmental invasion of his privacy. Because of the important role that a search warrant plays in protecting fourth amendment liberties, the Supreme Court has held that searches conducted without a warrant are *per se* unreasonable, "subject only to a few specifically established and well-delineated exceptions." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043, 36 L.Ed.2d 854 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)); *Chimel v. California*, 395 U.S. 752, 759, 89 S.Ct. 2034, 2038, 23 L.Ed.2d 685 (1969).

The Supreme Court first recognized the inventory exception to the warrant requirement in *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). In *Opperman*, the police impounded the defendant's unoccupied automobile after two parking tickets were issued charging that the car was parked in a restricted zone. At the impound lot, a police officer observed a watch on the dashboard and other items of personal property in plain view on the back seat and floorboard. Following routine procedure, the officer inventoried the contents of the automobile and discovered a plastic bag of marijuana in the unlocked glove compartment.

In upholding the search, the Supreme Court established the balancing test weighing the legitimate governmental interests advanced by the search against the invasion of privacy which the search entailed. The Court pointed out that an individual possesses a diminished expectation of privacy in an automobile because of the public nature of automobile travel and because automobiles, unlike homes or offices, are subject to pervasive governmental regulation and inspection. 428 U.S. at 367–68, 96 S.Ct. at 3096. Balanced against this diminished expectation of privacy, the Court weighed three governmental interests served by an inventory search: (1) the protection of the owner's property while it remains in police custody; (2) the protection of the police against claims or disputes over lost or stolen property; and (3) the protection of the police from potential danger. *Id.* at 369, 96 S.Ct. at 3097.

Based on the facts in *Opperman*, the Court concluded that the warrantless inventory search of the glove compartment did not violate the fourth amendment. The Court specifically emphasized that the defendant was unavailable to make other arrangements for the safekeeping of his belongings, and that the search was prompted by the presence of a number of valuables in plain view inside the vehicle. *Id.* at 375–76, 96 S.Ct. at 3100. *Cf. South Dakota v. Opperman*, 247 N.W.2d 673 (S.D.1976).

Although *Opperman* approved of automobile inventories in general, the Court's opinion did not foreclose challenges regarding the permissible scope of such searches. *Opperman* did not resolve whether law enforcement officers, in the course of an inventory search, could open and examine luggage and other closed containers, which, unlike a glove compartment, have privacy interests that are not diminished in any way. Four dissenters in *Opperman* stressed: "[T]he Court's opinion does not authorize the inspection of suitcases, boxes or other containers which might themselves be sealed, removed and secured without further intrusion." *Id.* 428 U.S. at 388 n. 6, 96 S.Ct. at 3106 n. 6 (Marshall, J., dissenting).

Because *Opperman* did not resolve the container question, courts subsequently looked to *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), and *United States v. Chadwick*, 433 U.S. 1,

97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), for guidance on the issue. Both decisions hold that the fourth amendment required exclusion of evidence seized by police officers in the warrantless search of closed containers found in an automobile. In *Chadwick*, the Court concluded that the warrantless search of a double-padlocked footlocker could not be justified under the automobile exception to the warrant requirement. Distinguishing the case from *South Dakota v. Opperman,* the Court stated:

> The factors which diminish the privacy aspects of an automobile do not apply to respondent's footlocker. Luggage contents are not open to public view, except as a condition to border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis. Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects. *In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile.*

433 U.S. at 13, 97 S.Ct. at 2484 (emphasis added).

Similarly, in *Arkansas v. Sanders,* 442 U.S. at 753, 99 S.Ct. at 2587, the Court held that the warrantless search of a suitcase seized from the trunk of a taxicab violated the fourth amendment. In his concurring opinion, Chief Justice Burger stated: "The essence of our holding in *Chadwick* is that there is a legitimate expectation of privacy in the contents of a trunk or suitcase accompanying or being carried by a person; that expectation of privacy is not diminished simply because the owner's arrest occurs in a public place." *Id.* at 766–767, 99 S.Ct. at 2594 (Burger, C.J., concurring).[3]

Several courts have extended the principles enunciated in *Chadwick* and *Sanders* to containers opened during the course of a routine inventory search. *E.g., United States v. Bloomfield,* 594 F.2d 1200 (8th Cir.1979) (inventory search of knapsack); *cf. United States v. Schleis,* 582 F.2d 1166 (8th Cir.1978) (inventory search of briefcase); *United States v. Calandrella,* 605 F.2d 236 (6th Cir.1979) (inventory search of briefcase). These cases recognized that an individual possesses a reasonable expectation of privacy in regard to sealed containers that must be respected during an inventory search.

In *People v. Counterman,* 192 Colo. 152, 556 P.2d 481 (1976), we held that an inventory search of a closed knapsack found inside an impounded vehicle violated the defendant's rights under the fourth amendment of the United States Constitution and article II, section 7 of the Colorado Constitution. Recognizing what the Supreme

---

**3.** Subsequent to *Chadwick* and *Sanders* the Supreme Court announced *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), *Robbins v. California,* 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981), and *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). In *Belton,* the Court held that when a police officer has made a lawful custodial arrest of an occupant of an automobile, he may contemporaneously search the passenger compartment of the automobile and any containers found within the passenger compartment. In *Robbins,* however, the court rejected the contention that the automobile exception to the warrant requirement justifies the warrantless search of closed containers found inside the automobile. The Court held that a container found during a lawful search of an automobile may not be opened without a warrant, unless the contents of the container are in plain view. Only one year after *Robbins* the Court reversed itself and declared in *Ross* that under the automobile exception to the warrant requirement, the police may conduct a warrantless search of the entire automobile, including all containers found inside the automobile.

The broad scope of the searches upheld in *Belton* and *Ross* was justified by the Court based upon the purposes of those searches. In a search incident to the arrest of an occupant of an automobile, the purpose is to prevent the arrested person from grabbing a weapon or trying to destroy evidence. Therefore, the containers in the passenger compartment may be searched because they are under the control of the arrested person. The purpose behind the automobile exception is to allow contraband to be seized from an automobile before it can be secreted away. This purpose justifies a search of the entire automobile and any containers found therein.

By contrast, the purposes supporting an inventory search of an automobile do not give the police unlimited authority to search any container found inside the automobile. *See supra* 414; *infra* pp. 416, 417–419.

Court later made explicit in *Chadwick* and *Sanders*, we stated that the defendant "clearly had an expectation of privacy with regard to his sealed knapsack which was sufficient to invoke constitutional protections against unreasonable police intrusion." 192 Colo. at 154, 556 P.2d at 483. Balanced against this strong privacy interest, we found that the government interests served by the search were relatively weak:

> The knapsack did not give any indication that its contents were dangerous or particularly valuable and in need of a special inventory. The legitimate purposes of the inventory search could have been fully accomplished by merely noting the item as a sealed knapsack. The defendant could have been offered the choice of a full inventory of the contents at the police station.

*Id.* at 158, 556 P.2d at 485.

In the present case, although the district court suppressed the evidence on state constitutional grounds, the court concluded that the inventory search of defendant's backpack did not violate the defendant's rights under the United States Constitution. The court reasoned that *Illinois v. Lafayette*, 462 U.S. at 640, 103 S.Ct. at 2606, rejected our fourth amendment analysis in *Counterman*. We disagree.

### III.

In *Lafayette*, the defendant was arrested in a movie theater for disturbing the peace and taken to the police station for booking. At the stationhouse, a police officer ordered the defendant to empty his pockets and place the contents on the counter. After doing so, the defendant took a package of cigarettes from his shoulderbag and placed the bag on the counter. The officer then removed the contents of the bag and found several amphetamine tablets inside a cigarette package. Relying on the government's overriding interest in preserving the security of the stationhouse and jail, the Court concluded that it was not unreasonable for the police to search any container or article in the arrested person's possession as a standard preincarceration procedure. 462 U.S. at 648, 103 S.Ct. at 2610–2611.

In our view, the holding in *Lafayette* is inapposite to this case. Unlike the present case, *Lafayette* did not involve an inventory search of an impounded automobile. The sole question in *Lafayette* concerned whether the police acted reasonably in searching the defendant's shoulderbag prior to incarceration.

This court has implicitly recognized that the governmental interests served by a preincarceration inventory search are invariably greater than the governmental interests advanced by the search of an impounded vehicle. *Compare People v. Glaubman*, 175 Colo. 41, 485 P.2d 711 (1971) *with People v. Counterman*, 192 Colo. at 152, 556 P.2d at 481.[4] Unlike an inventory search of an impounded vehicle, a preincarceration search is justified by the need to prevent the introduction of contraband or weapons into the jail facility. As the Court emphasized in *Lafayette:*

> Arrested persons have also been known to injure themselves—or others—with belts, knives, drugs or other items on their person while being detained. Dangerous instrumentalities—such as razor blades, bombs, or weapons—can be concealed in innocent-looking articles taken from the arrestee's possession. The bare recital of these mundane realities justifies reasonable measures by police to limit these risks....

462 U.S. at 646, 103 S.Ct. at 2609.

*Lafayette* is consistent with our decisions holding that the police have wide latitude in conducting searches in a jail setting. *See,*

---

**4.** In *Glaubman,* Boulder police arrested the defendant and transported him to police headquarters. There, the police searched a pouch found dangling from the defendant's trousers and discovered marijuana and LSD. We upheld the search "on the grounds that it was an inventory search incident to the Boulder police booking procedure which was designed to prevent Glaubman from causing contraband or weapons to be introduced into the jail and to insure security in the jail." 175 Colo. at 54, 485 P.2d at 718.

*e.g., People v. Glaubman,* 175 Colo. at 41, 485 P.2d at 711 (preincarceration search of pouch held reasonable); *Avalos v. People,* 179 Colo. 88, 498 P.2d 1141 (1972) (preincarceration search of purse held reasonable). *See also United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974). Because of the compelling need to prevent the introduction of weapons and contraband into a jail facility, we have generally upheld searches of purses and other containers in an arrested person's possession, even though the governmental interests supporting the search might conceivably have been achieved through less intrusive means.

As our decision in *Counterman* demonstrates, the same compelling governmental interests that justify broad searches in the jailhouse setting do not necessarily extend to inventory searches of impounded vehicles.[5] Generally, the governmental interests supporting an automobile inventory search are not as great as those supporting a preincarceration search. Therefore, police officers must give greater deference to the individual's expectation of privacy in the contents of his vehicle. *See, e.g., People v. Grana,* 185 Colo. 126, 527 P.2d 543 (1974) (search of zippered flightbag).

Because of the greater governmental interests served by a preincarceration search, *Lafayette's* broad language should not be extended to the facts in this case. We do not interpret *Lafayette* as giving police unbridled authority to search every container and package found in an automobile during a routine inventory search. Nor do we read *Lafayette* as stripping courts of all discretion to protect individuals from overintrusive invasions in the context of an automobile inventory search. The reasonableness of any automobile inventory search must, in our view, still be determined by applying the legal standards set forth in *Opperman* and *Counterman.*[6]

Applying those standards to this case, we hold that the inventory search of the backpack did not comply with fourth amendment standards of reasonableness. During the suppression hearing, the tow-truck operator testified that the impound lot was entirely enclosed by a six-foot fence; that the lot was locked and lighted; that no one other than the tow-truck company had access to the lot; that police officers and security officers routinely patrolled the area; and that to the best of his knowledge nothing had ever been stolen from a vehicle stored at the lot. Secure facilities for the defendant's automobile were thus available. *Compare People v. Grana,* 185 Colo. at 126, 527 P.2d at 543 (search unreasonable where impound lot was fenced and patrolled by dogs) *with South Dakota v. Opperman,* 428 U.S. at 366 n.1, 96 S.Ct. at 3095 n.1 (impound lot was an "old county highway yard" with a dilapidated wire fence where police had experienced difficulty with theft).[7]

---

**5.** In *Counterman,* we refused to extend our holding in *Glaubman* to inventory searches of automobiles.

**6.** Professor LaFave suggests the following five factors to examine after *Opperman* in determining whether a particular inventory search complies with fourth amendment standards of reasonableness: (1) whether the jurisdiction has secure facilities where impounded vehicles can be adequately safeguarded from vandals and thieves; (2) whether the car owner is available to make alternative arrangements; (3) whether the vehicle was likely to be impounded for a long period of time; (4) whether the police confined the search to parts of the car customarily used to store valuables; and (5) whether the search involved an intrusion into an area where the owner possessed an expectation of privacy. *See* 2 W. LaFave *Search & Seizure* § 7.4 (1978).

**7.** We recognize that simply because less intrusive means of safeguarding the defendant's property were available to the police in this case does not render the inventory search unreasonable. As the Court in *Illinois v. Lafayette* noted: "[T]he real question is not what 'could have been achieved,' but whether the Fourth Amendment *requires* such steps...." 462 U.S. at 647, 103 S.Ct. at 2609 (emphasis in original). Of course, in determining what the fourth amendment requires, we must balance governmental interests against the defendant's privacy interests. We believe that the availability of secure impoundment facilities in this case served to lessen the need of the police to conduct a detailed inventory search of defendant's vehicle.

In addition, the defendant here was available and the necessity or justification for a full inventory search of the automobile and its contents was not established. *Compare South Dakota v. Opperman*, 428 U.S. at 364, 96 S.Ct. at 3094, *and Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (unavailability of owner significant factor in upholding inventory search) *with People v. Counterman* (defendant available). In *Cady v. Dombrowski*, the defendant was involved in a one-car collision and arrested for driving under the influence of alcohol. At the direction of the police, the defendant's car was towed from the scene of the accident to a private garage. The defendant, an off-duty police officer at the time of the accident, was believed to have been carrying a revolver. The weapon was not found on the defendant's person or in the car at the scene of the accident. The Court upheld the action of the police in returning to the car and searching it without a warrant. The Court stated that since the police reasonably believed that a weapon might be found in the defendant's vehicle and might fall into the hands of vandals if not removed, the search was reasonable. The Court noted that at the time of the search the defendant was in a coma and thus unable to remove the weapon himself. In the present case, there was no similar exigency to justify the warrantless search of the defendant's backpack, and the defendant was available to make alternative arrangements for its safekeeping.

Most significantly, the search here involved an intrusion into a container intended as a repository of personal effects. Unlike the unlocked glove compartment in *Opperman*, containers such as backpacks do not carry a diminished expectation of privacy. *See Arkansas v. Sanders*, 442 U.S. at 753, 99 S.Ct. at 2587; *United States v. Chadwick*, 433 U.S. at 1, 97 S.Ct. at 2478. The defendant here, like the defendant in *Counterman*, clearly had an expectation of privacy with respect to the sealed knapsack that was sufficient to invoke constitutional protections against unreasonable searches and seizures.

We fail to see any factual exigencies or unique circumstances that would justify a departure from our holding in *Counterman*. If anything, the search here constitutes a much more serious invasion of privacy than the search in *Counterman*. Not only did the officer open and search the closed backpack, he also searched two other sealed containers inside the backpack before discovering the contraband in question. Even assuming that the officer acted reasonably in opening either the backpack or the sealed nylon bag, little justification existed for further intrusion into the sealed cans. We have repeatedly held that an inventory search must be limited to those areas where valuables or weapons may "reasonably" be found. *E.g., People v. Rutovic*, 193 Colo. 397, 566 P.2d 705 (1977); *People v. Grana*, 185 Colo. at 126, 527 P.2d at 543.

In this case, the tin cans gave little indication that their contents contained valuables or dangerous instrumentalities. Thus, the governmental interests served by the search were not substantial. *Accord State v. Jewell*, 338 So.2d 633 (La.1976) (inventory search of aspirin bottle held unreasonable since bottle was unlikely place for storage of valuables or weapons). Applying the balancing test established in *Opperman*, we conclude that the defendant's privacy interests in the cans outweighed the government's need to inventory their contents.

We also reject the prosecution's argument that the search should be upheld since the officer inventoried the backpack pursuant to Boulder Police Department directives. Although a finding that the police followed routine procedure is important in determining whether a search is reasonable, *see People v. Meeks*, 194 Colo. 214, 570 P.2d 835 (1977), such a finding should not end a court's inquiry. *See People v. Hicks*, 197 Colo. 168, 171, 590 P.2d 967, 969 (1979).[8] As one court has observed,

---

**8.** As we stated in *Hicks:*

The existence of a routinely required invento-

"[u]nconstitutional searches cannot be constitutionalized by standardizing them as a part of normal police practice." *State v. Jewell*, 338 So.2d at 640. Even though routine procedures have been followed, courts should not blind themselves to police practices that sanction an unlimited intrusion into areas where an individual clearly possesses a reasonable expectation of privacy. Simply put, the rights secured by the fourth amendment cannot be eliminated by administrative fiat. *See* Note, *Illinois v. Lafayette: Has the Fourth Amendment Vanished in the Face of Administrative Expediency?* 21 Cal.W.L.Rev. 218 (1984).

In conclusion, our decision in *Counterman* is dispositive of the issues raised in this appeal. We therefore affirm the trial court's order suppressing the evidence. Because we view the search here as violative of fourth amendment protections, we need not decide whether article II, section 7 of the Colorado Constitution provides citizens of this state with greater protections than the United States Constitution in the area of automobile inventory searches.

The trial court's suppression order is therefore affirmed.

ROVIRA, J., dissents, and QUINN, C.J., joins in the dissent.

ROVIRA, Justice, dissenting:

I respectfully dissent.

The majority holds that cocaine seized from the defendant's backpack during the course of a routine inventory search of his automobile incident to his lawful arrest violates the fourth amendment of the United States Constitution. In my opinion, this holding does not conform with recent pronouncements of the United States Supreme Court, beginning with *South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), and culminating with *Illinois v. Lafayette*, 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

*Opperman* held, for the first time, that a warrantless search of an automobile's unlocked glove compartment was valid under an inventory exception to the warrant requirement. Less rigorous warrant requirements were permitted in *Opperman*, in part, because the Court had traditionally drawn a distinction between automobiles and homes or offices in relation to the fourth amendment. 428 U.S. at 367, 96 S.Ct. at 3096. In addition to the element of mobility, less rigorous warrant requirements govern an automobile because the expectation of privacy is significantly less than that relating to one's home or office. *Opperman*, 428 U.S. at 367, 96 S.Ct. at 3096. *See also Cardwell v. Lewis*, 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974).

*Opperman*, however, left open the question of whether law enforcement officers, in the course of an inventory search, could open and examine closed containers found in vehicles. The scope of such searches was uncertain due to the differing expectations of privacy associated with containers as opposed to automobiles.

The majority now attempts to answer the container question by relying mainly on two cases decided after *Opperman*: *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), and *Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979). Majority op. at 414. These cases are cited for the proposition that evidence discovered as a result of searching a backpack in the course of an inventory search of an impounded vehicle should be excluded. However, *Chadwick* and *Sanders* lend only minimal, if any, support to the majority's position. Neither case involved an inventory search. Rather, both involved warrantless searches of luggage, suspected of containing marijuana, located in the trunks of automobiles.

ry procedure does not alone validate searches carried out pursuant to that procedure. If a warrantless inventory search were to be permitted "on any arrest when a [p]arty and [v]ehicle are separated," the exception which allows a warrantless inventory of an automobile's contents would soon eclipse the rule that a search warrant is the *sine qua non* of a Fourth Amendment search. 197 Colo. at 171, 590 P.2d at 969.

*Chadwick* held that the seized marijuana must be excluded because the search was not justified under either the "automobile exception" to the warrant requirement or as a search incident to lawful arrest. In *Chadwick,* the government did not even attempt to characterize the search as an inventory search. Similarly, *Sanders,* decided four years before *Lafayette,* involved a warrantless search of an unlocked suitcase found in the trunk of a taxicab. The cab was not impounded at the time of the search, but had been stopped shortly after leaving an airport.

Almost five months after *Opperman* was decided, this court decided *People v. Counterman,* 192 Colo. 152, 556 P.2d 481 (1976). There, we affirmed a trial court's suppression of cocaine discovered in a closed knapsack during an inventory search of an automobile. We found a greater expectation of privacy in containers and held the search violated both the fourth amendment of the United States Constitution and article II, section 7, of the Colorado Constitution for two reasons. First, its contents were not in plain view nor did the knapsack give any indication that its contents were dangerous or particularly valuable and in need of special inventory. Second, the legitimate purposes of the search could have been fully accomplished by merely noting the item as a sealed knapsack. 192 Colo. at 157–58, 556 P.2d at 485.

*Counterman* thus attempted to discern a hierarchy for inventorying containers based on their characteristics. Only those containers which gave an indication that their contents were dangerous or particularly valuable could be inventoried. Since the knapsack in *Counterman* was found not to have given any indication that its contents were dangerous or valuable, the scope of the inventory search was found to be constitutionally unreasonable. 192 Colo. at 158, 556 P.2d at 485.

The second basis for the court's holding in *Counterman* was that the existence of less intrusive alternatives is of greater significance in the context of container searches than automobile searches. We

found it significant in *Counterman* that "the legitimate purposes of the inventory search could have been fully accomplished by merely noting the item as a sealed knapsack" or "[t]he defendant could have been offered the choice of a full inventory of the contents at the police station." 192 Colo. at 158, 556 P.2d at 485.

Contrary to the opinion of the majority, I am convinced that the United States Supreme Court's recent decision in *Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983), now rejects the two bases of the holding in *Counterman* and therefore compels an opposite result in this case. Under *Lafayette,* it is plain that neither the characteristics of the container nor the existence of less intrusive alternatives plays a material role in determining the constitutionality of inventory searches of containers.

In *Lafayette,* a unanimous Court held that it was not "unreasonable" under the fourth amendment for police, as part of routine police procedure incident to incarcerating an arrested person, to search in accordance with established inventory procedures any container or article in his possession. 462 U.S. at 648, 103 S.Ct. at 2611. *See also Avalos v. People,* 179 Colo. 88, 498 P.2d 1141 (1972) (search of purse); *People v. Glaubman,* 175 Colo. 41, 485 P.2d 711 (1971) (search of pouch).

The *Lafayette* Court refused an opportunity to distinguish *Opperman* on the basis that there is a greater expectation of privacy in a purse-type shoulder bag than in an automobile, and that the legitimate governmental interests supporting an inventory search could have been met in a less intrusive manner by sealing the shoulder bag within a plastic bag or box and placing it in a secured locker. The Court did note the greater expectation of privacy in containers, but reaffirmed its position in *Chadwick* that probable cause to search is irrelevant in inventory searches, and that the salutary functions of a warrant simply have no application in the context of such searches. 462 U.S. at 643–44, 103 S.Ct. at 2608 quoting *United States v. Chadwick,*

433 U.S. 1, 10 n. 5, 97 S.Ct. 2476, 2482 n. 5, 53 L.Ed.2d 538 (1977).

Rejecting the argument that the shoulder bag could have been secured in a less intrusive manner, the Court stated:

> [T]he real question is not what 'could have been achieved,' but whether the Fourth Amendment *requires* such steps; it is not our function to write a manual on administering routine, neutral procedures of the stationhouse. Our role is to assure against violations of the Constitution.

*Lafayette,* 462 U.S. at 647, 103 S.Ct. at 2610 (emphasis in original). The Court further explained why the existence of a less intrusive alternative, one factor relied upon in *Counterman,* did not compel a different result:

> We are hardly in a position to second-guess police departments as to what practical administrative method will best deter theft by and false claims against its employees and preserve the security of the stationhouse. It is evident that a stationhouse search of every item carried on or by a person who has lawfully been taken into custody by the police will amply serve the important and legitimate governmental interests involved.
>
> Even if less intrusive means existed of protecting some particular types of property, it would be unreasonable to expect police officers in the everyday course of business to make fine and subtle distinctions in deciding which containers or items may be searched and which must be sealed as a unit.

462 U.S. at 648, 103 S.Ct. at 2611.

In opting for a single familiar standard for inventory searches of containers, the Court continued on the course charted in *New York v. Belton,* 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981), and *United States v. Ross,* 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), that a constitutional distinction cannot be made between containers on the basis of differing characteristics in the context of fourth amendment analysis. As Justice Stevens stated in *Ross:*

> When a legitimate search is under way, and when its purpose and its limits have been precisely defined, nice distinctions between closets, drawers, and containers, in the case of a home, or between glove compartments, upholstered seats, trunks, and wrapped packages, in the case of a vehicle, must give way to the interest in the prompt and efficient completion of the task at hand.
>
> ... A constitutional distinction between "worthy" and "unworthy" containers would be improper. Even though such a distinction perhaps could evolve in a series of cases in which paper bags, locked trunks, lunch buckets, and orange crates were placed on one side of the line or the other, the central purpose of the Fourth Amendment forecloses such a distinction.

456 U.S. at 821–22, 102 S.Ct. at 2170–71 (footnotes omitted). Therefore, the attempt in *Counterman* to distinguish between containers on the basis of their characteristics, whether they give an indication that their contents are "dangerous or particularly valuable," like the existence of less intrusive alternatives, was displaced by *Lafayette* for the purpose of inventory searches.

*New York v. Belton* is also germane to this case because it signaled the Court's willingness, in certain instances, to elevate legitimate law enforcement concerns over the individual's expectation of privacy in containers located within an automobile. *Belton* involved a search of the pockets of a coat found inside a vehicle which had been stopped for traveling at an excessive rate of speed. The Court held that a policeman who has made a lawful custodial arrest of an occupant of an automobile may contemporaneously search the passenger compartment of that automobile and containers located therein. 453 U.S. at 460, 101 S.Ct. at 2864.

The *Belton* Court, while recognizing the privacy interest one has in such containers, nevertheless opted to subordinate that interest to the overriding governmental interest of providing for the safety of police

officers conducting lawful custodial arrests. The Court stated: "Such a container may, of course, be searched whether it is open or closed, since the justification for the search is not that the arrestee has no privacy interest in the container, but that the lawful custodial arrest justifies the infringement of any privacy interest the arrestee may have." *Id.* at 461, 101 S.Ct. at 2864.

The competing interests present in *Belton* are similar to those in this case. On one hand is the admittedly strong privacy interest one has in a backpack containing personal belongings, on the other, the strong governmental interest in protecting the property of the arrestee, protecting police officers from false claims, and protecting persons from dangerous instrumentalities and illicit substances. In this case, after balancing the competing interests as the Court did in *Belton*, I find that the *Opperman* factors, when combined with the compelling need for a comprehensible and workable rule governing inventory searches, tip the scale in favor of the governmental interests.

Therefore, I believe the trial court in the instant case correctly concluded that *Lafayette* is not limited to inventory searches at the stationhouse incident to preincarceration of an arrestee, but also extends to inventory searches of automobiles. The same governmental interests of protecting the defendant's property, the police against false claims, and the police and the public against the potential danger or hazards posed by the impounded property are at work in both the stationhouse and the automobile, foreclosing any principled distinc-

tion between preincarceration inventory searches and inventory searches of automobiles.[1]

The majority nevertheless asserts that "this court has implicitly recognized that the governmental interests served by a preincarceration inventory search are invariably greater than the governmental interests advanced by the search of an impounded vehicle." Majority op. at 416. In an attempt to apply the third *Opperman* factor, the majority reasons that there is a more compelling need to search for weapons in the stationhouse than there is when searching an impounded vehicle. Although this reasoning is sound when searching the actual *person* of an arrestee, it makes absolutely no sense when applied to searches of *containers* within the detainee's possession. The police can just as easily note, seal, and store a backpack found on the person of an arrestee as it can a knapsack found in the back seat of an automobile. In both cases, once the container is removed from the reach of the arrestee, the threat of weapons or contrband being introduced to the jailhouse no longer exists. In both instances, sealing and storing the container is a viable means of avoiding a search of the container. Yet, *Lafayette* declined to impose on law enforcement agencies such a duty to seal and store.

The remaining two prongs of *Opperman* also apply no more convincingly in the context of a stationhouse search of an arrestee than in the context of an inventory search of an automobile. In regard to the goal of protecting the owner's property while it remains in police custody,[2] there is no con-

---

1. In some instances, the governmental interests supporting inventory searches may weigh more heavily to justify an automobile search than a search at the stationhouse. For example, a dangerous instrumentality located in an automobile may pose a greater threat to the public than it would if it were in police custody. *See Cady v. Dombrowski*, 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (revolver removed from trunk for safety of general public).

2. The majority assigns particular importance to the fact that the police searched not only the backpack but also the sealed tin cans within the

backpack. The court reasons that once the backpack was searched, there was "little justification ... for further intrusion into the sealed cans" because "an inventory search must be limited to those areas where valuables or weapons may 'reasonably' be found." Majority op. at 418, citing *People v. Rutovic*, 193 Colo. 397, 566 P.2d 705 (1977); *People v. Grana*, 185 Colo. 126, 527 P.2d 543 (1974). I think it may fairly be contended that it is not unusual for persons to keep valuables in their backpacks. Additionally, it was not unreasonable to think that the cans contained within the knapsack could have contained jewels

vincing distinction which would support a search of a container in the precustodial stationhouse situation while not in the impounded vehicle situation. Equally strained is the argument that the goal of protecting the police against false claims is somehow served by a full search of containers in the stationhouse but not those in an impounded automobile.

In sum, I believe that the compelling governmental interests that justify broad searches in the stationhouse do indeed extend to inventory searches of impounded vehicles. *Cf.* majority op. at 417. The governmental interests served by a complete preincarceration stationhouse search are no greater than those served by a complete inventory search of an impounded vehicle. In light of *Lafayette*, *Counterman* should be overruled.

The majority opinion also fails to recognize that several courts have concluded that the principles enunciated in *Lafayette* are not limited to containers in the possession of arrestees at the stationhouse but apply with equal force to containers found in inventoried vehicles. *United States v. Griffin,* 729 F.2d 475 (7th Cir.1984) (wrapped package in car), *cert. denied,* —— U.S. ——, 105 S.Ct. 117, 83 L.Ed.2d 60 (1984); *People v. Braasch,* 122 Ill.App.3d 747, 78 Ill.Dec. 67, 461 N.E.2d 651 (1984) (paper bag in trunk whether open or closed); *State v. Bronaugh,* 16 Ohio App.3d 237, 475 N.E.2d 171 (1984) (brown paper bag and suitcase in trunk). In fact, the only authorities cited by the majority which appear to be directly on point are cases which were decided prior to *Lafayette.* Majority op. at 415.

Since *Lafayette* rejected the notion that a container carried by an arrestee should be sealed rather than searched, one commentator predicts it is "[d]oubtless the Court would reach precisely the same conclusion as to containers within inventoried vehicles." 2 W. LaFave, *Search and Seizure* § 7.4 at 262 (1984 Supp.) (footnote omitted). Accordingly, I agree with the trial court that the inventory search, conducted pursuant to standard procedure, of the backpack

located in the automobile was not unreasonable under the fourth amendment.

While the trial court correctly realized that *Lafayette* has displaced our fourth amendment analysis in *Counterman,* and that the search did not violate the defendant's rights guaranteed by the United States Constitution, I believe it erred in finding that *Lafayette* did not overrule this court's "interpretation" of article II, section 7, of the Colorado Constitution set forth in *Counterman.* On that basis alone, the trial court suppressed the contents of the backpack. Contrary to the trial court's analysis, *Counterman* did not purport to establish adequate and independent state constitutional grounds to justify the suppression of the contents of the container inventoried there. Rather, article II, section 7, of the Colorado Constitution was simply cited and interpreted coextensively with the fourth amendment. Because the fourth amendment was found to have been violated, article II, section 7, was necessarily found to have been violated as well. In short, nothing in *Counterman* suggested that state and federal constitutional analysis should diverge in the context of inventory searches. The mere citation to article II, section 7, cannot be summarily interpreted as a departure from federal law in the area of an inventory search and seizure.

I would accordingly reverse the order of the district court suppressing the cocaine and remand the case for further proceedings.

I am authorized to say that Chief Justice QUINN joins in this dissent.

---

or currency. Indeed, the third tin can contained

$700 in cash. Majority op. at 413.